Argued and submitted January 10, 1995, decision of the Court of Appeals affirmed; judgment of the circuit court reversed October 11, 1996

Patrick W. CONWAY,
*Petitioner on Review,*

*v.*

PACIFIC UNIVERSITY,
*Respondent on Review.*

(CC C920640 CV; CA A80633; SC S41611)

924 P2d 818

Bernard Jolles, of Jolles, Bernstein & Garone, P.C., Portland, argued the cause for petitioner on review. With him on the petition was Rick Klingbeil.

Thomas M. Christ, of Mitchell, Lang & Smith, Portland, argued the cause for respondent on review. With him on the briefs was Scott J. Meyer.

Alfredo Wheelock, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.**

CARSON, C. J.

Fadeley, J., dissented and filed an opinion.

Durham, J., dissented and filed an opinion in which Fadeley, J., joined.

---

** Unis, J., retired June 30, 1996, and did not participate in this decision.

## CARSON, C. J.

In this action for negligent misrepresentation, the issue before us is whether the law imposed a duty upon the defendant, Pacific University (or "the university"), to exercise reasonable care in making certain representations to Conway, the plaintiff.

The facts of this case are as follows.[1] In 1990, Conway was a professor at Central Oregon Community College (COCC), holding a "tenure-track" position. At COCC, the end goal of a tenure-track position was to achieve tenure after a requisite number of years of employment. In the fall of 1990, Conway took a leave of absence from COCC to work as a visiting professor on Pacific University's campus during the 1990-91 academic year. The university had hired Conway to serve as a temporary replacement, in order to fill a vacancy in the university's psychology department, while the university searched for a permanent replacement. During the 1990-91 academic year, Conway had a one-year, "term appointment" with the university.[2]

In January 1991, Conway applied for the permanent, tenure-track position in Pacific University's psychology department. In May 1991, the university offered Conway that position. In the meantime, Conway had received student evaluations for the fall 1990, semester that were below those of the average teacher employed by the university. Conway spoke to some of his colleagues about how those student evaluations might affect his future employment. One colleague suggested that Conway speak to the Dean of the College of Arts and Sciences (the dean) about his concerns.

Shortly after Pacific University offered Conway the new position, Conway approached the dean and, after a conversation about seniority, salary, and other matters, asked whether his poor student evaluations would affect his

---

[1] Because a jury rendered a verdict in Conway's favor, we consider the facts in the light most favorable to Conway. *See Hatfield v. Gracen,* 279 Or 303, 305, 567 P2d 546 (1977) (stating principle).

[2] At Pacific University, a term appointment was a contract issued for a specified time that could be from one to three years.

chances to receive tenure. The dean told Conway that the student evaluations "will not be a problem."

After that conversation, Conway resigned his position with COCC and accepted the new position with Pacific University. Conway returned to teach on the university's campus in the fall of 1991 under an annual, "tenure-track" appointment. During the spring of 1991 and during the 1991-92 academic year, Conway's student evaluations did not improve. After several remedial efforts, the university offered Conway only a nonrenewable, one-year contract for the 1992-93 academic year. In large part, that decision was based upon Conway's poor student evaluations.

Conway filed this tort action, claiming that the dean negligently misrepresented to him that the student evaluations would not affect his prospects of receiving tenure.[3] Before trial, Pacific University moved to dismiss the claim, arguing that Conway had not stated a claim for negligent misrepresentation because Conway and the university did not have the type of relationship that gave rise to a duty of care on the university's part to avoid making negligent misrepresentations to Conway. The trial court deferred ruling on that motion until later in the proceedings. At trial, after Conway had completed his case-in-chief, the university moved for a directed verdict based upon several grounds, including its prior argument that the alleged misrepresentations were not actionable because the university did not owe Conway a duty of care. The trial court denied that motion, and, subsequently, the jury returned a verdict for Conway on the negligent misrepresentation claim and awarded economic and noneconomic damages.

---

[3] Conway also filed a breach of contract claim against Pacific University. The basis for that claim was that Conway could be terminated only for certain circumstances detailed in his employment contract and that the "[u]se of student evaluations as the sole or principal measure of teaching excellence [was] not a legitimate reason for nonrenewal" of that contract under its terms. At the close of evidence, the trial court entered a directed verdict for the university on the contract claim. However, the trial court still allowed the jury to consider the contract claim under ORCP 63 B. The jury returned a verdict for the university on the contract claim. That claim is not before us.

Pacific University appealed to the Court of Appeals, arguing that "plaintiff cannot recover for negligent misrepresentation, because the misrepresentation occurred during arm's-length negotiations about the tenure track position, and * * * negligent misrepresentations made during arm's-length negotiations are not actionable." *Conway v. Pacific University*, 129 Or App 307, 309-10, 879 P2d 201 (1994). The Court of Appeals agreed with the university and concluded that, "in negotiating about a possible employment contract with plaintiff, Pacific [University] was not in a special relationship with plaintiff that would give rise to a duty to exercise due care regarding representations that it made in the course of negotiations." *Id.* at 313. Consequently, the Court of Appeals held that the trial court should have granted the university's pretrial motion to dismiss the negligent misrepresentation claim. *Ibid.*

Conway petitioned this court for review. We allowed the petition and now affirm the decision of the Court of Appeals.

■ As noted above, the trial court deferred ruling on Pacific University's pretrial motion to dismiss Conway's claim for negligent misrepresentation. The court ultimately rejected the university's argument in support of dismissal, but the court did so in the context of ruling on the university's motion for a directed verdict. We therefore address the denial of the motion for directed verdict, rather than the motion to dismiss, and we consider the evidence presented at trial in determining whether the university owed Conway a duty to avoid making negligent misrepresentations. Upon review of a denial of a motion for a directed verdict, we will not set aside a jury verdict "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of [the] plaintiff's cause of action." *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984).

In *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992), this court acknowledged, for the first time, that Oregon recognized the existence of a limited version of the common-law tort of negligent misrepresentation. In that case, the plaintiffs and the defendants were

parties to a land sale contract. Before the contract negotiations were complete, the defendants told the plaintiffs that, upon payment, certain parcels of land would be released to the plaintiffs. After payment by the plaintiffs, the defendants did not release the parcels, stating that the parcels could not be released until they were resold to third parties. *Id.* at 153-55. The plaintiffs brought a claim for negligent misrepresentation. *Id.* at 155.

This court stated that, "under some circumstances, one may be liable for economic loss sustained by others who rely on one's representations negligently made." *Id.* at 159. The court emphasized, however, that "a negligence claim for the recovery of economic losses caused by another must be predicated on some duty of the negligent actor to the injured party *beyond the common law duty to exercise reasonable care to prevent foreseeable harm.*" *Ibid.* (footnote omitted; emphasis added). The court then concluded that the defendants in *Onita* did not owe a duty to exercise reasonable care to avoid making negligent misrepresentations to the plaintiffs, because "the relationship was adversarial. In an arm's-length negotiation, a negligent misrepresentation is not actionable." *Id.* at 165.

Conway contends that, unlike the arm's-length relationship between the parties in *Onita*, Conway and Pacific University were in the type of relationship that gave rise to a duty on the university's part to exercise reasonable care to avoid making negligent misrepresentations to Conway about his future employment status. The university, on the other hand, contends that no such duty existed. For the reasons that follow, we conclude that the university did not owe Conway a duty to avoid making negligent misrepresentations.

■      As noted above, in Oregon, the tort of negligent misrepresentation requires that one party in a relationship owe a duty "beyond the common law duty to exercise reasonable care to prevent foreseeable harm" to the other party. *Onita*, 315 Or at 159. Under *Onita*, that kind of heightened duty arises when one party is acting, at least in part, to further the economic interests of the other party. *Id.* at 161. In other

words, for the duty to avoid making negligent misrepresentations to arise, the parties must be in a "special relationship," in which the party sought to be held liable had some obligation to pursue the interests of the other party.

In *Onita*, this court surveyed some of the types of relationships in which one party owes the other a heightened duty of care, including certain professional relationships in which one party has a professional obligation to protect the interests of the other party. *Id.* at 160-61. This court further recognized that "contractual relationships may also give rise to a tort duty to exercise reasonable care on behalf of another's interests." *Id.* at 160. That is, parties to a contract may place themselves in the type of relationship that gives rise to a duty in tort. Indeed, "it may be necessary for a plaintiff to show a contract between himself and the defendant in order to establish that the defendant has assumed a position, relationship or status upon which the general law predicates a duty independent of the terms of the contract." *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 104, 831 P2d 7 (1992) (quoting *Harper v. Interstate Brewery Co.*, 168 Or 26, 37, 120 P2d 757 (1942) (internal quotation marks omitted)).

■   In analyzing a relationship between contracting parties that may give rise to tort liability, it is important to note the distinction between contractual and tort obligations. Obligations specified by the terms of a contract are "based on the manifested intention of the parties to a bargaining transaction." W. Page Keeton, ed., *Prosser and Keeton on the Law of Torts*, § 92, 656 (5th ed 1984). Obligations in tort, or "duties," on the other hand, are "imposed by law—apart from and independent of promises made and therefore *apart from the manifested intention of the parties*—to avoid injury to others." *Id.* at 655 (emphasis added). In other words, a contract details the specific obligations that each party owes the other and, if one party breaches a term of the contract, that breach will result in contract liability. For tort liability to be imposed, however, a tort duty must exist "*independent of the contract and without reference to the specific terms of the contract.*" *Georgetown Realty*, 313 Or at 111 (emphasis added); *see also Harper*, 168 Or at 37 ("If from the position, contractually assumed, a duty be raised *independent of the contract*[,] an action in tort may lie." (emphasis added)). That

duty in tort does not arise from the terms of the contract, but from the *nature of the parties' relationship. Georgetown Realty*, 313 Or at 102 (citing *Currey v. Butcher*, 37 Or 380, 385, 61 P 631 (1900)) (emphasis added).

Just as a significant difference exists between contractual obligations and tort duties, so too is there a distinction between the breach of a contractual obligation and the breach of a duty in tort. This court summarized its treatment of the relationship between the breach of contractual obligations and tort duties in *Georgetown Realty*:

> "The lesson to be drawn from this court's cases discussing the choice between contract and tort remedies is this: When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence *if the other party is subject to a standard of care independent of the terms of the contract*. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of contract was negligent, intentional, or otherwise. In some situations, a party may be able to rely on either a contract theory or a tort theory or both." 313 Or at 106 (emphasis added).

In this case, at the time of the dean's misrepresentations about Conway's student evaluations, Conway and Pacific University were in a contractual employment relationship. At that time, the university also had in force a "University Handbook" that, among other things, contained provisions requiring the university to provide its employees with information pertaining to their job performance and career advancement.[4] In his claim for negligent misrepresentation,

---

[4] For the purposes of this opinion, we shall treat the University Handbook as part of the employment contract between the parties. *See Yartzoff v. Democrat-Herald Publishing Co.*, 281 Or 651, 656, 576 P2d 356 (1978) (stating that an employee handbook can become part of the employment contract).

Conway relies, in part, upon those handbook provisions, contending that they created a contractual obligation on the university's part to further Conway's economic interests, giving rise to a duty in tort. Conway also contends that, by virtue of the contract's terms, the university was a "nongratuitous supplier of information" under *Onita* and, consequently, owed Conway a duty to avoid making negligent misrepresentations about Conway's future employment status. For the reasons that follow, we conclude that neither contention is well taken.

To determine whether Pacific University owed Conway a duty to exercise reasonable care to avoid making misrepresentations, "we examine the nature of the parties' relationship and compare that relationship to other relationships in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship." *Onita*, 315 Or at 160. Therefore, as in *Onita*, we first examine the types of relationships in which one party owes the other a duty to exercise reasonable care beyond the common-law duty to prevent foreseeable harm.

**5, 6.** Oregon law imposes such a duty of care upon certain professionals in actions toward their clients. For example, lawyers owe their clients a duty to exercise reasonable care, as do physicians toward their patients. *See Chocktoot v. Smith*, 280 Or 567, 570, 571 P2d 1255 (1977) (lawyers); *Dowell v. Mossberg*, 226 Or 173, 190, 355 P2d 624, *on reh'g* 226 Or 187, 359 P2d 541 (1961) (physicians). In addition, if a contract between a professional and a client incorporates a general standard of skill or care to which the professional would be bound, independent of the contract, the professional may be liable in tort. *Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 262, 611 P2d 1158 (1980). Both engineers and architects may owe a duty of care in that situation. *Ibid.*; *see also Bales For Food v. Poole*, 246 Or 253, 255-56, 424 P2d 892 (1967) (engineers); *Ashley v. Fletcher*, 275 Or 405, 405-06, 550 P2d 1385 (1976) (architects).

Other types of relationships also may carry a heightened duty of care. For example, agents in a principal-agent relationship have a duty to act with due care and in their principals' interests. *See Hampton Tree Farms, Inc. v. Jewett*,

320 Or 599, 617, 892 P2d 683 (1995) (creditor who agreed to represent log seller, for the purpose of selling the latter's company, acted as seller's agent and, therefore, owed seller a duty to act with due care and in seller's interests); *Lindland v. United Business Investments*, 298 Or 318, 322-24, 693 P2d 20 (1984) (real estate broker, acting as seller's agent, owed seller duty to exercise due care and to disclose material facts). Trustees also owe a heightened duty to act in the best interests of their beneficiaries, as well as a duty to act in good faith. *See Strickland v. Arnold Thomas Seed*, 277 Or 165, 169-70, 560 P2d 597 (1977) (agent for marketing pool of seed growers deemed to be trustee who owed fiduciary duty to growers). Pledgees exercising a power of sale, shippers, and bailors also must exercise due care in behalf of their pledgors and customers. *Harper*, 168 Or at 38. Finally, a liability insurer who undertakes a duty to defend owes its insured a duty of care that exists independent of the insurance contract, because the insured effectively relinquishes control over the defense to the insurer and places the insured's potential monetary liability in the insurer's hands. *Georgetown Realty*, 313 Or at 110-11.

■ In *Onita*, this court described the relationships summarized above as those in which the party who owes a duty of care is acting, "at least in part, * * * to further the economic interests of the 'client,' the person owed the duty of care." 315 Or at 161. Another way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a *special responsibility* toward the other party. This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution.

This special responsibility exists in situations in which one party has hired the other in a professional capacity, as well as in principal-agent and other similar relationships. It also exists in the type of situation described in

*Georgetown Realty*, in which one party has relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands. In all those relationships, one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party. That special responsibility carries with it a duty to exercise reasonable care to avoid making negligent misrepresentations.

We now must examine the nature of the relationship between Conway and Pacific University and compare it to the types of relationships in which one party owes the other a heightened duty to exercise reasonable care, as described above. In doing so, we examine all aspects of the relationship between Conway and the university, including their employment contract, in order to determine whether the university had a special responsibility to exercise independent judgment in Conway's behalf. However, we emphasize that, in examining the contract, in keeping with the commands of *Georgetown Realty*, we do not seek to determine whether any contractual obligations on the university's part gave rise to a tort duty to avoid making negligent misrepresentations to Conway. Rather, we must determine whether the terms of the contract create the *type of relationship* that gives rise to such a tort duty. In other words, the exercise of examining the contract serves to help determine the type of relationship between the parties, but *not* to determine the existence or type of duty that the university may have owed to Conway.

We first note that, unlike the situation in *Onita*, Conway and Pacific University were not strangers coming to the bargaining table to negotiate a first-time contract because, at the time that the misrepresentations were made, they already were in a contractual employment relationship. Consequently, Conway and the university were not in a fully arm's-length relationship in the same sense as were the parties in *Onita*.

When compared to the types of relationships in which one party has a special responsibility toward the other,

however, the relationship between Conway and Pacific University still falls short. Conway did not authorize the university to exercise independent judgment in his behalf, by contract or otherwise, thereby placing him in the position of having a right to rely upon the university.[5] Indeed, at the time of the misrepresentations, both parties were acting in their *own* behalf, each for their own benefit, for the purpose of negotiating a renewal of Conway's contract. In that context, then, the university did not have a special responsibility toward Conway to exercise independent judgment in his behalf and to administer, oversee, or otherwise take care of any of his affairs. Consequently, the parties were not in a special relationship giving rise to a duty of care on the university's part to avoid making negligent misrepresentations to Conway.

Conway contends that the handbook provisions that required Pacific University to provide its employees with information related to their job security demonstrate that the university was required to act to further Conway's economic interests, thereby giving rise to a duty of care under *Onita*. Even if we agreed that those handbook provisions, in some way, obligated the university to act in Conway's economic interest, we disagree that those provisions create the type of relationship that gives rise to a duty to avoid making negligent misrepresentations. As we already have concluded, nothing in those provisions demonstrates that the university had a special responsibility to exercise independent judgment in Conway's behalf.[6]

---

[5] We must emphasize the distinction between Conway's relying upon the dean's misrepresentations and Conway's being placed in a position in which he had a *right* to rely upon Pacific University. In this case, by virtue of its verdict in Conway's favor, the jury found that Conway did, in fact, rely upon the dean's statement that the poor student evaluations "will not be a problem." However, if Conway and the university were not in the type of relationship in which the university had a special responsibility to act in Conway's behalf, Conway did not have a *right* to rely upon the university to achieve a particular outcome or result in his behalf.

Moreover, the fact that Conway trusted the dean to communicate accurate information did not transform the relationship between Conway and Pacific University into a "special relationship." *See Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 648-50, 891 P2d 639 (1995) (court rejected the plaintiff's contention that, because of the plaintiff's reliance upon the defendant's assurances of success and a history of prior dealings between the parties, "a special relationship of trust and confidence" existed between the plaintiff, a developer, and the defendant, the plaintiff's creditor (internal quotation marks omitted)).

[6] In his argument that Pacific University was contractually obligated to act in his economic interest, Conway also relies upon additional handbook provisions

■   Conway also contends that, by virtue of the handbook provisions that required Pacific University to provide Conway with certain information, the university was a "nongratuitous supplier of information" under *Onita* and, consequently, owed Conway, a beneficiary of that information, a duty to avoid making negligent misrepresentations. We reject that contention. In *Onita*, this court did state that "nongratuitous suppliers of information owe a duty to their clients or * * * to intended third-party beneficiaries of their contractual, professional, or employment relationship to exercise reasonable care to avoid misrepresenting facts." *Onita*, 315 Or at 165. However, earlier in its opinion, the *Onita* court distinguished between an adversary in a sales transaction, who does not owe a duty to avoid making negligent representations, and "*one who holds out to the general public* that he or she supplies information," who does owe such a duty. *Id.* at 162 (emphasis added). That statement suggests that a "nongratuitous supplier of information" under *Onita* is someone in the business of supplying information for a fee. Accordingly, the university, which *contractually* promised to provide its *employees*, not the general public, with certain information, does not qualify as a nongratuitous supplier of information. Indeed, if we were to characterize the university as a nongratuitous supplier of information based solely upon a contractual obligation to provide information, the effect would be to transform that contractual obligation into a tort duty to avoid making negligent misrepresentations. In doing so, we would violate the rule that a tort duty must exist "independent of the contract and without reference to the specific terms of the contract." *Georgetown Realty*, 313 Or at 111.[7]

stating that "[t]he intent of the tenure policy and employment practices of Pacific University is to strengthen the University by providing * * * reasonable employment security for its professors" and that "[e]mployment must always be in the institutional interest as well as the individual interest." We reject that proposition for the same reason already stated: Because those contractual provisions do not demonstrate that the university had a special responsibility to exercise independent judgment in Conway's behalf, Conway and the university were not in the type of relationship that gave rise to a duty in tort on the university's part to avoid making negligent misrepresentations to Conway.

[7] We again emphasize that, although parties may place themselves in the type of relationship that gives rise to an independent tort duty, they normally do not *create* a tort duty by virtue of the contract's terms. Unlike contractual obligations, which represent the manifested intent of the parties, *tort duties are imposed by law, regardless of the intent of the parties*. Indeed, duties in tort are

██    Finally, Conway also contends that the employer-employee relationship is a "special relationship" imposing a special duty of care upon the employer. We disagree. In the circumstances of this case, the fact that Conway and Pacific University were in an employer-employee relationship has no effect upon our determination that the university did not have a special responsibility to exercise independent judgment in Conway's behalf and to look after Conway's interests. Instead, as discussed above, Conway and the university each were pursuing their own interests at the time that the dean made the misrepresentations to Conway.[8] Consequently, the parties were not in a special relationship that gave rise to a duty of care on the university's part to avoid making negligent misrepresentations to Conway.

In summary, we conclude that the relationship between Conway and Pacific University did not rise to the level of a special relationship such that the law imposed a duty in tort upon the university to exercise due care to avoid making negligent misrepresentations to Conway. Accordingly, Conway cannot prevail on a claim for negligent misrepresentation.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed.

**FADELEY, J.,** dissenting.

I fully concur in the dissent of Justice Durham, following this special dissent. I write further, however, because the rationale offered by the majority opinion is founded on

---

"imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction. Therefore, if the alleged obligation to do or not to do something that was breached *could not have existed but for a manifested intent*, then contract law should be the only theory upon which liability would be imposed." W. Page Keeton, ed., *Prosser and Keeton on The Law of Torts*, § 92, 656 (5th ed 1984) (emphasis added; original emphasis omitted).

Moreover, as we have discussed, the fact that Pacific University might have breached the contract provisions requiring it to provide Conway with information concerning his employment security does *not* mean that the university is liable to Conway in tort.

[8] *See generally Hall v. The May Dept. Stores*, 292 Or 131, 141, 637 P2d 126 (1981) (stating that, "in many respects[,] employment remains an arm's-length, adult relationship between parties intent on securing divergent rather than joint interests").

faulty concepts not there discussed. *The Restatement (Second) of Torts* has got it right, not the majority. A negligent misrepresentation in the course of one's business or professional discourse is actionable by those damaged by the careless failure to tell the truth in that setting.

The majority holds in this case that a university dean has no duty (or, as the majority would require, no "heightened duty") to exercise care to tell the truth. In the majority view, there is no duty in this case for a dean to avoid damaging a faculty member by negligently misrepresenting to and misleading the faculty person, even one who comes to that dean for specific information on promotion or tenure. The effect of the majority holding in this case is that *as a matter of law*, there is no special relationship of the sort needed, *as a matter of fact*, between a dean and a faculty member, or between a university and its professors.

The majority acknowledges that there is such a relationship between most other professionals and the persons who rely or who may be expected to rely or act on information provided by them in their profession. The majority simply holds that that sort of professional relationship rule does not apply here, and thus bases its holding in this case on its own factual declaration that the nature of the relation between a dean and a professor, or a university and a professor, is adversarial, being but a relation grounded in the individual economic self-interest of each and, thus, a relation that rises only to an "arms-length" negotiation between business adversaries.

When examined, the authority offered for this misanthropic outlook is no more than *ipse dixit, i.e.,* "because we say so." The majority offers no cases or examples relating to a university community; indeed, the majority does not deny the accuracy of the statements about the special relationships in a university community that are included in this dissenting opinion. Instead, the majority relies on its adversarial, dog-eat-dog construct that is contrary to the university community's own view of the relation between a university, its academic dean, and one of its professors. The jury returned its verdict for plaintiff for negligent misrepresentations made by the dean to the professor.

The relationships between professionals in university communities, as seen by members of those communities, does not support the dog-eat-dog approach. Over the course of this century, many members of the university community have indicated that a special relationship exists among professionals in that community such that they are not arm's-length adversaries. A few examples related to university relationships should suffice, inasmuch as the majority provides no examples to the contrary.

After citing a report of the Carnegie Foundation for the Advancement of Teaching and Woodrow Wilson's essay "What Is A College For?," the dean of an Oregon law school 63 years ago declared that there is a special relationship between the faculty and a state university, as follows:

> "That leads me to another observation. A university is not a factory or a department store * * *.
>
> "There is a need to recognize that faculty members are highly trained specialists and scholars and constitute a professional class of at least as high standing as doctors, lawyers, engineers, and other professionals."[1]

The parents of students and other listeners who heard that declaration and the remainder of the dean's speech about university governance arranged for the dean's full remarks to be mailed to all parents of students attending that university at that time.

Later, in 1936, also attesting that a university is a special community, James Bryant Conant said, "He who enters a university walks on hallowed ground." In the Godkin Lectures at Harvard University in 1963, Clark Kerr, speaking as executive head of the extensive system of universities in California, described facets of the job of the university's top official,

> "The university has become the multiversity and the nature of the presidency has followed this change.
>
> "* * * * *

---

[1] *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 160-61, 843 P2d 890 (1992), stated that such enumerated professionals would be liable for negligent misrepresentation. The dean is an analogous professional in my view, a view that is not disputed.

"The president in the multiversity is leader, educator, wielder of power, pump; he is *also* officeholder, caretaker, inheritor, consensus-seeker, persuader, bottleneck. But he is mostly a mediator." Clark Kerr, *The Uses of the University*, 34, 36 (1963).

No internal dog-eat-dog philosophy within the university is expressed above.

Assuming that the statements of individual leaders of university communities, unrebutted, are not enough to establish special, professional relationships within that sort of community, there is much more. Statements declaring the special relationship have been made on a national level implicating all universities and faculty. In 1966, building on earlier cooperative statements dating back to 1940, the Association of Governing Boards of Universities and Colleges and representatives of their faculties, the American Council on Education, and the American Association of University Professors, jointly drafted and issued a statement entitled the Joint Statement on Government of Colleges and Universities.

The Joint Statement acknowledges the special "relationship" among all participants in the university community, stating:

"The variety and complexity of the tasks performed by institutions of higher education produce an inescapable *interdependence* among governing board, administration, faculty, students, and others. *The relationship* calls for adequate communication among these components, and full opportunity for appropriate joint planning and effort." American Association of University Professors, *Policy Documents and Reports*, 120 (7th ed 1990) (emphasis added).

The Joint Statement describes a role for faculty in the selection of "academic deans" and also points out that:

"[B]uilding of a strong faculty requires careful joint effort in * * * staff selection and promotion and the granting of tenure." *Id.* at 121.

In part V, entitled "The Academic Institution: The Faculty," the Joint Statement asserts:

"Faculty status and related matters are primarily a faculty responsibility; this area includes appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal." *Id.* at 123.

Those examples demonstrate that, in the university community setting, the status of dean and of professor connote a special, interdependent relationship between them that best forwards their common enterprise when the dean uses due care not to mislead the professor to her or his detriment, and vice versa.

On questions of promotion and tenure, the dean is an information bridge between the university, its faculty, and the students. The dean is, in that situation, a professional giving professional advice. All are engaged in a common enterprise of ancient origin. That common-enterprise concept of the university community was adopted by the Oregon Legislature (and remains the statutory law of this state for public universities). ORS 352.010 provides in part:

"The president and professors constitute the faculty of each of the state institutions of higher education and as such have the immediate government * * * of it and the students therein."

No dog-eat-dog concept there.

The examples of recognized special relationships among a university, its dean, and its faculty could be multiplied manyfold. But there seems little reason to do so here, because the majority offers no contrary examples or other authorities for its arm's-length view. Had the majority tested its dog-eat-dog construct by relating it to a university setting, that testing would have revealed that it is part of the dean's job to communicate knowledge and information on the subjects of tenure and promotion. Those are, of course, the subjects about which the jury in this case found, as fact, that the dean misrepresented to the plaintiff as a faculty member, who then relied on the dean's negligently uttered misinformation to his substantial damage.[2]

---

[2] The jury, drawn from the vicinity in which defendant had provided higher education services for 150 years, determined that the dean's careless misrepresentations damaged the plaintiff, who, relying on the dean's professional advice, gave

Employing *ipse dixit* to duck the facts found by a jury is a constitutionally forbidden practice in Oregon. Facts determined by a jury are not to be "otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict." Or Const, Art VII (Amended), § 3. The exception in the "unless" clause does not apply here. No one can say that there was no evidence of the special relationship existing between the dean, as an academic professional and agent of the university, and the faculty professional for whom the jury rendered its verdict in this case. The majority does not deny the presence of that evidence. Instead, the majority declares that the evidence is not good enough, even though it shows that the risk of harm to plaintiff was foreseeable and that the dean's carelessness (*i.e.*, his negligent misrepresentation on behalf of the university) caused that foreseeable harm.

The majority opinion permits the law to be, in effect, (a proposition of law from which I also dissent), that in Oregon one can play fast and loose with the truth, provided that it is in a business negotiation and that one's negligent misrepresentations cause only economic harm. Of course, those provisos do not fit the facts of this case, or the law as declared in *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 843 P2d 890 (1992), because the dean is a professional giving advice here. The majority, nonetheless, applies that rule within this community of professionals. I dissent.

**DURHAM, J.,** dissenting.

In *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992), this court recognized the tort of negligent misrepresentation and said that

"[t]he rule stated in Restatement (Second) of Torts § 552[1] * * * is close to the mark. But, for the reasons that follow,

---

up a secure job at another college to take the position offered at the university. They assessed damages in the amount of $95,000, of which $5,000 were not economic damages.

[1] *Restatement (Second) of Torts* § 552 (1977) provides:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

rather than adopting a black letter 'rule,' we opt to develop the scope of the duty and the scope of recovery on a case-by-case basis, in the light of related decisions of this court."

The *Onita* court relied on the following reasoning in concluding that the *Restatement* rule did not impose liability for negligent misrepresentation in the relationship between business adversaries negotiating at arm's length in a commercial setting:

"The text of section 552 and the comments and illustrations thereto suggest that the editors, in using the words '[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions,' had in mind relationships other than the relationship between persons negotiating at arm's length. The comments provide no illustrations dealing with business adversaries in the commercial sense." *Id.* at 164.

The court concluded that the parties in *Onita*, who were buyers and sellers of real property, occupied the latter relationship and, consequently, that no liability existed.

*Onita* misreads the *Restatement* rule. By its terms, the rule applies whenever one acts in the course of one's business, profession, or employment, or in a transaction in which one has a pecuniary interest, and negligently supplies false information for the guidance of others in their business transactions. The requirement that the negligent misrepresentation occur in the course of the speaker's business, profession, or employment, or in a transaction in which the speaker is interested pecuniarily, concerns the relationship

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

"(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

between the speaker, the speaker's business or professional activities and interests, and the statement made. If the statement bears a sufficient relationship to the speaker's business activities and interests, the *Restatement* rule recognizes liability for the resulting harm. The salutary policy behind that rule is that, in the business environment, those persons who negligently communicate false factual statements for the guidance of others in their financial transactions should be liable for the resulting harm. Neither that policy nor the text of the *Restatement* rule precludes the rule's application to parties, like those in *Onita*, who are business adversaries negotiating at arm's length in a commercial setting.[2]

Some other case may afford the opportunity to correct the *Onita* majority's mischaracterization of the *Restatement* rule.[3] That exercise is unnecessary here, because the evidence in the record satisfies even the narrow formulation of the rule described in *Onita*.

According to *Onita*, the judicial task is to determine whether some aspect of the parties' relationship distinguishes it from that of business adversaries negotiating at arm's length. 315 Or at 160. The court listed two circumstances in which the duty to avoid making negligent misrepresentations would exist.

---

[2] The *Onita* majority's conclusion that the *Restatement* rule governs only particular *relationships*, and does not apply to arm's-length *relationships*, is a mischaracterization. The rule applies to conduct occurring in the course of one's business, profession, or employment, or in a transaction in which one has a pecuniary interest. *Restatement* § 552(1). The rule recognizes a duty to use due care to avoid negligent misrepresentations *whenever* one acts in the course of those types of transactions and is not limited to transactions between parties who occupy fiduciary or other special relationships.

[3] The *Onita* majority's articulation of the rule appears to have been more a result of its faulty interpretation of the *Restatement* rule than a decision to depart from the *Restatement* rule. Because the *Onita* majority apparently was operating from a flawed understanding of the rule, its description of the rule, in retrospect, seems both artificial and confused. To cite but one example, the announcement in *Onita* that fiduciaries can be sued for economic losses caused by their negligent misrepresentations would surprise no one because, for many years, the law already had imposed tort liability on fiduciaries for such losses through theories of malpractice, interference with contract or prospective economic advantage, and ordinary negligence, among others. In that regard, the net effect of *Onita's* departure from the *Restatement* rule was to extend to plaintiffs a theory of potential liability that they did not need and to protect defendant fiduciaries from liability in circumstances in which they already enjoyed adequate protection.

First, the court noted that certain professionals owe an obligation to their clients to exercise reasonable care when acting on their clients' behalf. The court cited lawyers, engineers, architects, real estate brokers, and primary insurers as examples of the types of professionals upon whom the law imposes a duty of care. *See id.* at 160-61 (citing pertinent cases).

Second, the court stated that "contractual relationships may also give rise to a tort duty to exercise reasonable care on behalf of another's interests." *Id.* at 160. The court stated:

> "We read Restatement section 552 as consistent with the rule that this court has adopted for negligence actions for the recovery of economic losses, *viz.*, nongratuitous suppliers of information owe a duty to their clients or employers or to intended third-party beneficiaries of their contractual, professional, or employment relationship to exercise reasonable care to avoid misrepresenting facts." *Id.* at 165.

According to *Onita*, if a contract requires one party to supply information for the benefit or guidance of another in a business transaction, the law imposes a duty on the nongratuitous supplier of information to avoid misrepresenting facts. In that circumstance, the tort duty arises " 'from the relation of the parties under the contract, rather than the contract itself.' " *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 102, 831 P2d 7 (1992) (quoting *Currey v. Butcher*, 37 Or 380, 385, 61 P 631 (1900)). The *Onita* court analyzed the record for the presence of either of those circumstances and concluded that neither existed. *Onita*, 315 Or at 161-65.

By recognizing, pursuant to the *Restatement* rule, the liability of nongratuitous suppliers of information for negligent misrepresentation resulting in economic losses, *Onita* would give effect to the policy of the *Restatement* rule, *i.e.*, to fulfill the reasonable expectation of participants in commercial transactions that one who, in the course of business, profession, or employment, acts to guide another in a business transaction or decision by supplying information must use due care to avoid supplying false information.

In a discussion that is relevant to its analysis of the "nongratuitous supplier of information" concept, the majority

acknowledges that "Conway and the university were not in a fully arm's-length relationship in the same sense as were the parties in *Onita*," 324 Or at 241, and that, due to their existing employment relationship, they "were not strangers coming to the bargaining table to negotiate a first-time contract," *Ibid.* The import of those statements is obvious. Conway and the university were not business adversaries negotiating at arm's length. Conway had a right to receive and rely on information supplied by the university's agent regarding tenure prospects. Because the university was Conway's partner in the contract to supply accurate tenure information, Conway had no reason to treat the university as his adversary.

The majority avoids the logical import of its statements by creating a new barrier to liability that *Onita* did not impose. The majority states:

> "However, earlier in its opinion, the *Onita* court distinguished between an adversary in a sales transaction, who does not owe a duty to avoid making negligent representations, and '*one who holds out to the general public* that he or she supplies information,' who does owe such a duty. *Id.* at 162 (emphasis added). That statement suggests that a 'nongratuitous supplier of information' under *Onita* is someone in the business of supplying information for a fee. Accordingly, the university, which *contractually* promised to provide its *employees*, not the general public, with certain information, does not qualify as a nongratuitous supplier of information." *Id.* at 243 (emphasis in original).

*Onita* adopted no such limitation on who may qualify as a nongratuitous supplier of information. The passage from *Onita* quoted by the court was a summary—an inaccurate summary, at that—of a law professor's statement in an article;[4] the summary was never referred to or adopted as a holding of the *Onita* court.

---

[4] The entire passage in *Onita* says:

"Similarly, Professor Alfred Hill distinguishes between misrepresentations made by an adversary in a sales transaction and by one who holds out to the general public that he or she supplies information and has noted:

" 'The situation is different in the case of "antagonists." When the aggrieved person is a buyer, who does not complain of the negligent performance of a service but rather of misrepresentation by a seller inducing the making of a contract, the conceptual mold has been different from the inception of modern contract law: the options have been to sue on the contract or to sue in deceit, without a middle ground consisting

The trial court applied *Onita* and concluded that Conway and the university were not business adversaries negotiating at arm's length. I cannot fault that analysis. Even the majority acknowledges that Conway and the university were not in an arm's-length relationship, as were the parties in *Onita*, and that Conway had a right to receive accurate information regarding his tenure prospects from the university. 324 Or at 238, 241. Certainly Conway should have the right to rely on information about tenure that he is entitled by contract to receive. Under the rule articulated in *Onita*, the university was exposed to liability for its negligent misrepresentation as a nongratuitous supplier of information.

The evidence in the record supports the jury's determination that, in telling Conway that his student evaluations would be "no problem," the university's agent negligently misrepresented a fact that was critical to Conway's goal of obtaining tenure. The evidence indicates that, aside from student evaluations, plaintiff's file contained no negative material on which defendant could have based a termination decision. It cannot be gainsaid that, as the jury found, the denial of tenure was a significant injury to Conway's professional career as a professor. *See* John D. Copeland and John W. Murray, Jr., *Getting Tossed From the Ivory Tower: The Legal Implications of Evaluating Faculty Performance*, 61 Mo L Rev 233, 238-39 (1996):

> "Obviously, faculty members have an equally important interest in the evaluation process. Nontenured faculty members are year-to-year employees and must be concerned about the nonrenewal of their contracts following a poor evaluation. In most institutions, tenure track faculty members who do not achieve tenure within a specified period of time are then given terminal contracts for only one more year of service. Those who are thus 'tossed from the

---

of actionable negligence.' Hill, *Damages for Innocent Misrepresentation*, 73 Colum L Rev 679, 688 (1973).

"Hill also states that allowing recovery for negligent misrepresentations made in the bargaining process would undermine the law of contracts, especially rules of law concerning written contracts. *Id.* at 717-18." *Onita*, 315 Or at 162.

That passage makes clear that Professor Hill did not mention, let alone require, that a nongratuitous supplier of information must be a person who holds out to the general public that he or she supplies information.

ivory tower' are denied not only the prestige, security, and financial benefits associated with tenure, but are also stigmatized as being 'unworthy' faculty members. As 'tainted goods,' their prospects of employment at other institutions of higher learning may be very limited."

Like the trial court, I would uphold the jury's verdict.

I respectfully dissent.

Fadeley, J., joins in this dissenting opinion.