324 F.Supp.2d 1152 (2004)
Roy B. THOMPSON, Trustee, on behalf of the THORPE FAMILY CHARITABLE REMAINDER UNITRUST, Plaintiff,
v.
Leonel FEDERICO, a resident of the State of Arizona, and Citigroup Global Markets, Inc. a New York corporation, f/k/a Salomon Smith Barney, Inc., Defendants.
No. Civ.03-496-MO.
United States District Court, D. Oregon.
July 8, 2004.
*1153 *1154 *1155 *1156 Amy M. Bogran, Thompson & Bogran PC, Lake Oswego, OR, John H. Mayfield, *1157 III, John Mayfield, Attorney at Law, Beaverton, OR, for Plaintiff.
Bruce L. Campbell, Ky B. Fullerton, Miller Nash, LLP, Portland, OR, for Defendants.

OPINION AND ORDER
MOSMAN, District Judge.
Plaintiff Roy Thompson acts as a trustee for a trust whose investment accounts were formerly managed by defendant Leonel Federico. Plaintiff alleges the trust suffered about $1 million in losses under Federico's watch. In an attempt to recover those losses, plaintiff brings negligence and fraud claims against Federico and his employer, Citigroup Global Markets, f/k/a Salomon Smith Barney, Inc. ("SSB"). Each side has filed a motion for summary judgment. For the reasons discussed below, the court DENIES plaintiff's motion (doc. # 33), and GRANTS in part and DENIES in part defendants' motion (doc. # 40).

I. BACKGROUND
In this securities case, plaintiff Roy Thompson in his capacity as a trustee claims that defendant Leonel Federico, while he was employed at Dean Witter and defendant SSB, caused plaintiff's trust to incur substantial losses. Plaintiff's allegations of misconduct on the part of Federico can be generally categorized thusly: (1) he failed to follow plaintiff's instructions to liquidate certain of the trust's holdings, (2) he made "dangerous" investments on behalf of the trust, and (3) he created a February 2002 investment proposal which did not adequately reflect plaintiff's instructions.

A. The Parties
The Trust Thorp Family Charitable Remainder UniTrust ("Trust") was formed on June 11, 1999, for the benefit of Robert and Judy Thorp. In November 1999, plaintiff Roy Thompson, a Portland attorney, was appointed trustee, a position he currently holds.
Defendant Leonel Federico is a stockbroker. He acted as the Trust's broker from August 1999 through August 2002. During this period, Federico worked for two different brokerage houses, Dean Witter (from August 1999 until April 2000) and SSB (from April 2000 until August 2002). As part of Federico's job change in April 2000, SSB agreed to perform brokerage and investment services for the Trust. In August 2002, plaintiff elected to end the relationship with defendants and directed defendants to transfer the Trust's holdings in SSB's possession to UBS Paine Webber. Thereafter, defendants transferred nearly all of the Trust's holdings to UBS Paine Webber. Despite the transfer to Paine Webber, as of May 2004, defendants had possession and control of approximately $14,000 of the Trust's assets.
Plaintiff in this lawsuit sues only Federico and SSB. Plaintiff, however, has brought claims against Dean Witter based on Federico's conduct while working there. Plaintiff's claims against Dean Witter presently are before a New York Stock Exchange arbitration panel, because the Trust's agreement with Dean Witter included an arbitration clause. (Although the SSB agreement included an arbitration clause, the parties agree it does not apply in this case, apparently because plaintiff crossed through the clause before signing the agreement.)

B. Non-Discretionary Trust Agreement
The Trust's "program agreement" with SSB provided that defendants lacked any independent discretionary authority over the Trust's accounts:
6. Additional Understandings: Client [plaintiff] understands and agrees to *1158 the following: Neither SSB nor any of its Financial Consultants, employees, or representatives will act or is acting as an investment advisor or investment manager or in a discretionary capacity with respect to Client ... for purposes of the Program nor will they provide specialized services or investment advice different from that which is solely incidental to SSB's business as a broker-dealer and customarily provided or available where brokerage and other transaction-related charges are paid on a per trade basis....
(Emphasis added). In a letter dated October 17, 2000, plaintiff counseled Federico: "While we appreciate your investment advice, it is important to make it clear that as the financial consultant to the Trust you are to have no discretionary authority to make investments on behalf of the Trust." Thus, plaintiff continued, "all investments on behalf of the Thorp Family Charitable Remainder Unitrust [must] first be cleared with the Trustee."

C. Alleged Dangerous Investments
At its inception in June 1999, the Trust's investment assets were worth a total of about $2,500,000.00. They reached a high of $2,700,000.00 in 2000. In February 2002, the Trust's assets had a total value of about $1,800,000.00.
Plaintiff contends that while Federico was with Dean Witter he made a number of dangerous investments on behalf of the Trust. These investments are the subject of the pending arbitration proceedings.
Plaintiff also alleges that Federico made dangerous investments on behalf of the Trust while he was with SSB. More specifically, plaintiff complains about Federico's decision to invest in an entity known as El Paso Partners L.P. ("El Paso"). Federico arranged for the Trust to purchase El Paso shares on July 28, 2000. Sometime in August 2000 plaintiff became concerned that the El Paso investment might generate unrelated business income and thereby jeopardize the Trust's non-profit tax status. As a result plaintiff ordered Federico to rescind the purchase of the El Paso shares. Although there has been no adverse action taken against the Trust because of the El Paso investment, plaintiff fears the IRS might decide to audit the Trust and discover the El Paso-generated income on some uncertain date in the future, thus placing the Trust's tax status at risk.
Aside from the El Paso investment, plaintiff additionally alleges that Federico, while with SSB, made other dangerous investments. The only other transaction plaintiff specifies, however, is Federico's July 2002 purchase of Worldcom stock.

D. February 2002 Investments Proposal
As mentioned, by February 2002, the Trust's assets were valued at around $1,800,000.00, a $700,000.00 decline from the Trust's beginning value in June 1999. On February 21 or 22, 2002, plaintiff and the Trust's attorney, Garth Nicholls, phoned Federico to express their concern about the Trust's assets' declining value. Plaintiff ordered Federico to stabilize the Trust's fluctuating value. Plaintiff and Nicholls thus requested that Federico devise a new investment strategy. In a February 26, 2002, letter, plaintiff reiterated that he wanted a revised investment strategy which would "[s]top the hemorrhaging of money from the Trust assets [and] essentially stabilize the trust value." In that letter, plaintiff asked Federico to collaborate with other SSB investment experts in formulating the new strategy.
In February or March 2002, Federico and SSB compiled an 83-page paper delineating five investment strategies available *1159 to the Trust. The paper compared the relative risks and predicted outcomes of the five alternative strategies. The strategies proposed different allocations of the Trust's assets; in general, the strategies proposed shifting more of the investment allocation from large-company stocks to cash, bonds, and small-company stocks. In large part, the paper relied on standard marketing materials. Plaintiff complains that the paper merely confused the relevant investment issues and set forth inappropriate investment strategies in light of the request to stabilize the Trust's value and his desire to abandon the equities market. Nicholls testified that the investment proposals failed to meet plaintiff's objective of ensuring that the Trust could effectively satisfy its obligations in the near term. Plaintiff, therefore, declined to pursue any of the five strategies.
In May 2002, the parties again discussed the five investment strategies proposed by Federico's February paper. Plaintiff reiterated his dissatisfaction with the five proposed strategies, given he wanted to pull the Trust out of the equities market. By the summer of 2002, the stock market was on a consistent downward trend. The Dow Jones Industrial Average fell from around 9,700 in the beginning of June to around 8,700 by the end of July. The NASDAQ fared poorly as well.

E. Liquidation Order
According to plaintiff's version of events, on May 31, 2002, he phoned Federico and instructed him to liquidate all of the Trust's assets invested in the stock market, in light of the market's downward trend. During that conversation, plaintiff contends, Federico agreed he should and would liquidate the Trust's equity holdings. Plaintiff further contends that they agreed that the Trust would maintain its positions in safer investments such as cash and bonds. In June the stock market continued to decline.
On June 9, 2002, Federico sent a letter to plaintiff acknowledging that the stock market seemed to be in the midst of a steep decline. The next day, on June 10, Federico phoned plaintiff to discuss the Trust's assets and the stock market's decline. According to plaintiff, during that June 10 conversation, he again ordered Federico to "liquidate [and convert] the Trust's equity position to cash, keeping the bond and cash investments intact." Plaintiff thus contends that he unambiguously ordered Federico to liquidate the Trust's stocks and also that Federico agreed to do so. On June 12, 2002, plaintiff sent a letter to Federico stating:
This letter is to confirm our phone conversation of a few weeks ago. You explained to me that you felt the market was at a point at which you desired to liquidate some positions and hold the cash in reserve until sometime in the fall when you would re-evaluate which investments to purchase. I am in agreement with you regarding this strategy and hope you have started. Please call me when you have decided which investments are best suited to the goals we outlined earlier this year.
Plaintiff contends that the letter's language "some positions" referenced his understanding Federico would liquidate all of the Trust's equity holdings while maintaining bond and cash holdings.
Federico takes a different view of the June correspondence with plaintiff: According to Federico, plaintiff ordered only a "limited" selling-off in that no wholesale equity liquidation was to occur unless plaintiff later specifically directed such a liquidation. Federico and plaintiff did not communicate again until July 22, 2002, when the Trust's value had dropped to about $1,500,000.00 During the July 22 conversation, according to Federico, plaintiff for the first time gave specific instructions *1160 to liquidate the Trust's equity holdings. On that very day, Federico thus began liquidating the Trust's stock.
During the July 22 conversation between Federico and plaintiff, Mr. Nicholls (the Trust's attorney) took notes. His notes state, in pertinent part:
Federico acknowledged that [he] had instructions from [plaintiff] to liquidate to cash position  these were given at least 2 months ago. However, he had not followed instructions because he want[ed] to liquidate on market upswings and there had not been any  so [he] never followed instructions to convert to cash position.
Nicholls testified at his deposition that his relationship with Federico was on friendly terms until Federico failed to "follow the instructions to liquidate the account." Nicholls understood the brunt of the June correspondence between Federico and plaintiff to mean Federico would liquidate the Trust's equity holdings. Nicholls further testified that in response to plaintiff's question posed on July 22, 2002, why Federico had failed to follow the prior instructions to liquidate, Federico responded he was waiting for a market upturn before liquidating the assets. Nicholls also reiterated that on July 22 Federico acknowledged that he had disregarded plaintiff's earlier instructions to liquidate all the stock.

F. Alleged Failure to Transfer Assets
As mentioned, in August 2002, plaintiff on behalf of the Trust decided to terminate the relationship with Federico; plaintiff then ordered Federico to transfer the assets to Paine Webber. Plaintiff asserts that defendants failed to transfer about $14,000.00 worth of Trust assets despite plaintiff's explicit instructions to do so. Plaintiff claims when he received notice that not all the Trust's funds had been transferred, he repeatedly and unsuccessfully called SSB to get the funds transferred. Plaintiff contends that had defendants properly liquidated the assets, they would have increased in value.
Defendants admit plaintiff asked for an asset-transfer request in August 2002. However, defendants contend that the disputed $14,000.00 worth of assets was not transferred because it was not available for transfer. According to defendants, the assets in question were a debenture from a company in Chapter 11 reorganization in August 2002. Thus, defendants explain, the debenture could not be transferred in August 2002 as requested. The debenture has since been converted, pursuant to the reorganization, to cash and common stock. Defendants maintain that the cash and common stock are held by SSB in the Trust's name and can be transferred at any time.

G. Plaintiff's Claims
Based on the foregoing events, plaintiff asserts a number of claims. He alleges one federal claim for securities fraud under Section 10(b) the Securities Exchange Act and federal regulatory Rule 10b-5. Plaintiff also brings five claims under state common law theories: negligence, breach of contract, fraud, negligent misrepresentation, and breach of fiduciary duty. Finally, plaintiff asserts a state statutory claim for unlawful trade practices, see ORS 646.608.
Defendants moved for summary judgment as to all of plaintiff's claims. Plaintiff, in turn, moved for partial summary judgment on his claims for breach of contract, breach of fiduciary duty, and unlawful trade practices, as those claims relate to defendants' alleged wrongful retention of the $14,000.00 worth of assets.

II. SUMMARY JUDGMENT STANDARD
Pursuant to Fed.R.Civ.P. 56(c) the party moving for summary judgment carries the *1161 burden of establishing that no genuine issues of material fact exist and it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant carries this burden, the nonmovant must go beyond the pleadings and "by its own evidence set forth specific facts showing that there is a genuine issue for trial." Far Out Productions, Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir.2001). A fact is material only if the applicable substantive law identifies the fact as critical to the case's outcome. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In resolving a motion for summary judgment, a district court must not weigh conflicting evidence, and all justifiable inferences must be taken in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

III. DEFENDANT'S SUMMARY JUDGMENT MOTION
As mentioned, defendants move for summary judgment against all of plaintiff's claims. The court discusses defendants' numerous arguments in turn.

A. "Dangerous" Investments Bought Through Dean Witter
Defendants contend that plaintiff's claims predicated on allegedly "dangerous" investments purchased from Dean Witter must be arbitrated given that those investments are the subject of the pending arbitration before the Stock Exchange. Plaintiff does not dispute that the Dean Witter agreement's arbitration clause is very broad, given that the record indicates that the clause covers "all controversies ... arising out of or concerning any of [plaintiff's] accounts, orders or transactions." Plaintiff, however, contends that his tort claims, carefully parsed, complain not about the purchase of the investments but rather about the "retention" of those investments.
The court agrees the Dean Witter-related claims involve issues which this court should not consider. Many of the allegedly dangerous investments were made while Federico was with Dean Witter. Plaintiff himself initiated arbitration proceedings based on those investments, because he believed that the Trust's agreement with Dean Witter required arbitration. Now, to avoid arbitration, plaintiff asserts his claims are based on retention, not purchase, of the investments. Whether plaintiff complains about purchase or retention, however, the core issue remains whether or not the Dean Witter investments were "dangerous." That core issue is pending before the arbitration panel. Given plaintiff's acknowledgment that the relevant arbitration clause applies to investments bought through Dean Witter, the clause's broad language, and lack of any persuasive explanation for why that clause does not apply to the Dean Witter-related claims asserted here, the court cannot say "`with positive assurance that the arbitration clause does not govern'" those claims. PNI, Inc. v. Leyton, No. 03-1344, 2004 WL 555249, at *2 (D.Or. March 1, 2004) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). The court thus dismisses plaintiff's claims to the extent they are based on investments purchased through Dean Witter.
The next issue becomes whether the court should stay this litigation pending resolution of the arbitration. The court easily concludes that staying litigation of the entire case would be inappropriate given that most of the transactions and events at issue occurred while Federico was at SSB and thus are not before the arbitration panel.

*1162 B. Federal Securities Claim
Plaintiff's amended complaint argues that defendants violated federal securities laws  specifically, Section 10(b) of the Securities Exchange Act and Rule 10b-5. Reading plaintiff's allegations in his favor plaintiff's federal claims are based specifically on the following two events: (a) Federico's alleged failure to design an appropriate investment strategy as plaintiff requested in February 2002, and (b) his failure to liquidate the Trust's equity holdings as requested in May and June 2002.
To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must prove: "(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [plaintiff] relied (5) which proximately caused [plaintiff's] injury." DSAM Global Value Fund v. Altris Software, LLP, 288 F.3d 385, 388 (9th Cir.2002). Defendants, in effect, argue that the evidence is insufficient to show an actionable misstatement or omission of material fact and the requisite scienter.
In 1976, the Supreme Court first discussed the scienter requirement. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Court found Congress's language in Section 10(b) ("manipulative," "device," and "contrivance") to manifest an unambiguous intent to limit the Section's application to "knowing or intentional misconduct." Id. at 197, 96 S.Ct. 1375. The Court expressly declined to determine whether recklessness could satisfy the scienter requirement. Id. at 194 n. 12, 96 S.Ct. 1375. Resolving the issue left open by the Supreme Court, the Ninth Circuit has held that in a civil damages action the scienter requirement may be met by proving "`deliberately reckless or conscious misconduct.'" Altris Software, 288 F.3d at 388 (quoting In re Silicon Graphics, Inc. Secs. Litig., 183 F.3d 970, 974 (9th Cir.1999)). The following qualifies as recklessness sufficient to meet the scienter requirement:
a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.
Hollinger v. Titan Cap. Corp., 914 F.2d 1564, 1569 (9th Cir.1990) (en banc).
In addition to omission and affirmative misrepresentation cases, courts have long held, as defendants concede, that promissory fraud may support a claim under Section 10(b) and Rule 10b-5. See, e.g., Ouaknine v. MacFarlane, 897 F.2d 75, 80-81 (2d Cir.1990); Pross v. Katz, 784 F.2d 455, 457-58 (2d Cir.1986) (Winter, J.); Burns v. Paddock, 503 F.2d 18, 23 (7th Cir.1974). While securities claims based on fraud "usually consist[ ] of a misrepresentation, concealment, or non-disclosure of a material fact," a person's "state of mind is, of course, a fact" and thus may support a securities fraud claim. Keers & Co. v. American Steel & Pump Corp., 234 F.Supp. 201, 203 (S.D.N.Y.1964). Thus, for instance, "a seller concealing intent not to sell" may be a Rule 10b-5 violation. Arnold S. Jacobs, Disclosure & Remedies Under the Securities Laws § 12.24 (updated 2004). A mere failure to perform a promise, however, is not sufficient to state a fraud claim under federal securities law (although such a failure may support a breach of contract or other claim). See, e.g., Keers, 234 F.Supp. at 203. Instead, to state a securities fraud claim based on broken promises, there must be "proof that at the time the promises were made the promisor had no intention of keeping them," since it is "the lack of intention to *1163 perform" which "constitutes the fraud." Id.
Consistent with the out-of-circuit case law holding that a material promise made without intention to perform constitutes fraud under federal securities laws, the Ninth Circuit has held that entering into an agreement of "sale with the secret reservation not to fully perform it is fraud cognizable under § 10(b)." Walling v. Beverly Enterps Corp., 476 F.2d 393, 396 (9th Cir.1973); accord Threadgill v. Black, 730 F.2d 810, 811-12 (D.C.Cir.1984) (per curiam, including Scalia, J.). In so holding, the Ninth Circuit relied on the time-honored principle, "`to promise what one does not mean to perform, or to declare an opinion as to future events which one does not hold, is a fraud.'" Id. at 396 n. 6 (quoting L. Loss, Securities Regulation 1436-37 (1st ed.1961)). The court, however, emphasized that not "every breach of a stock sale agreement adds up to a violation of the securities law." Id. at 397. Whether a promise was made with fraudulent intent depends on reference to the case's "facts and circumstances" including events "subsequent" to the time the promise was made. Id. at 397 & n. 8.
Plaintiff relies on two events to support his claim under Section 10(b) and Rule 10b-5: First, plaintiff contends that defendants' February 2002 investment proposal constituted fraud in that the proposal failed to respond accurately to plaintiff's request for a more balanced and effective investment strategy. Second, plaintiff argues that defendants' failure to comply with his unambiguous instructions to liquidate the Trust's equity holdings amounted to fraud.

1. February 2002 Investment Proposal
As for the February 2002 proposal, the court concludes there is insufficient evidence of recklessness to support a claim under Section 10(b) and Rule 10b-5. At bottom, plaintiff complains that the proposal did not effectively reflect plaintiff's goal of shifting more holdings from equity to safer investments including cash and bonds. However, on its face the proposal offers five investment alternatives which generally would have increased the percentage of investments in cash, bonds, and real estate, while decreasing the percentage of the Trust's stock holdings. It is difficult to see how the proposal is evidence of any culpable conduct, much less "deliberately reckless or conscious misconduct." Altris Software, 288 F.3d at 388. Moreover, plaintiff does not explain how the proposal made any misrepresentations or omissions of material fact; rather, the proposal merely answered plaintiff's request that Federico formulate new investment alternatives. Even accepting plaintiff's allegations as true plaintiff, at best, makes a case for ordinary negligence which is insufficient to support a claim under Section 10(b) and Rule 10b-5. In summary, plaintiff has insufficient evidence showing that Federico's formulation of the February proposal involved any "knowing or intentional misconduct." Ernst & Ernst, 425 U.S. at 197, 96 S.Ct. 1375. Nor does plaintiff show that formulating the proposal involved any omissions amounting to "an extreme departure from the standards of ordinary care." Hollinger, 914 F.2d at 1569 (citation omitted).

2. Liquidation Instructions
As mentioned, plaintiff also alleges that Federico's disregarding the instructions to liquidate the Trust's equity holdings constituted fraud for purposes of the federal securities laws. Defendants respond that this allegation does not support a claim: First, defendants contend that the evidence fails to show plaintiff gave instructions that were sufficiently clear enough to inform Federico he had to *1164 liquidate the equity holdings. Second, according to defendants, plaintiff does not show any knowingly false representation made by Federico regarding plaintiff's instructions to sell, if any. Defendants additionally contend they did not, with regard to such instructions, make any promises they did not intend to keep.
At the outset, the court rejects defendants' position that there are no material issues of fact regarding whether plaintiff clearly instructed Federico to sell the Trust's equity holdings. First, in his affidavit, plaintiff avers the following:
On or about May 31, 2002, I called Defendant Federico and directly instructed him to liquidate the Trust's assets that were invested in the stock market, because of the continued drop in the stock market. In our telephone conversation, he agreed with me that he should do so, and in that telephone call agreed that he would liquidate the stock positions in the Trust's portfolio. Our conversation made it clear that, due to the recent drop in the stock market, it was imperative to begin a rapid liquidation of the Trust's stock portfolio, while retaining the safer investments such as bonds and cash.
(Emphasis added).[1] In his affidavit, plaintiff further states that on June 9, 2002, plaintiff received a letter from Federico in which Federico gave dire assessments of the equity market, for instance, saying that the market was "headed for a collapse." As a result, on June 10, 2002, plaintiff again gave Federico "unambiguous" instructions to liquidate the Trust's equity holdings. Federico, plaintiff avers, promised to follow plaintiff's liquidation instructions "immediately." Thus plaintiff presents evidence of two instances of unambiguous instructions and return promises to liquidate. Aside from plaintiff's affidavit, the Trust's attorney, Mr. Nicholls, testified he heard Federico during a conversation on July 22, 2002, acknowledge his failure to follow plaintiff's prior liquidation instructions. Based on this evidence, construed in favor of the nonmovant plaintiff, the court concludes plaintiff specifically instructed Federico to liquidate the Trust's equity holdings.
The next, and more difficult, issue is whether Federico's failure to follow instructions is sufficient on this record to *1165 defeat summary judgment. This issue is a close one, but, ultimately, the court finds sufficient evidence allowing plaintiff to get past summary judgment.
Plaintiff essentially complains that Federico promised to liquidate the Trust's equity holdings in compliance with plaintiff's specific instructions to do so immediately. See, e.g., Thompson Aff. ¶¶ 11-13 (averring that in the May 31, 2002 conversation Federico "agreed that he would liquidate the stock positions in the Trust's portfolio" and that on June 10, 2002, Federico "promised that he would [liquidate] immediately"). At bottom, therefore, plaintiff's fraud claim rests on Federico's failure to perform a promise of future action; that is, the claim does not cite any misrepresentation or omission of a material fact separate from Federico's subjective intentions to liquidate the Trust's equity. Thus, as the court reads plaintiff's claim, he must show that at the time plaintiff instructed Federico to liquidate the equity holdings Federico "secretly intend[ed] not to perform" despite his promises to do so. Pross, 784 F.2d at 458.
Drawing all inferences in plaintiff's favor, the record suggests that Federico lacked an intention to liquidate the Trust's equity holdings at the time he made promises to do so. Federico promised on May 31, 2002, to liquidate the Trust's shares. On June 9, 2002, Federico wrote a letter essentially explaining that, although it appeared that the market was "headed for collapse," he remained "bullish" (i.e., optimistic) about the future of the market.[2] The next day, on June 10, plaintiff called Federico instructing him, again, to sell the Trust's equity holdings. Federico promised to do so. As of July 22, 2002, however, Federico had not begun to liquidate the Trust's equity holdings. During the July 22, 2002, conversation, Federico explained that he failed to liquidate because he had been "waiting to sell into a rise."
Taking all inferences in plaintiff's favor, Federico expressly promised twice to sell the Trust's shares immediately even though he intended to use the market, rather than plaintiff's instructions, as his guide for when to sell. Even assuming Federico's failure to carry out his May 31, 2002, promise to sell would not alone be enough to support plaintiff's claim, Federico's subsequent failure to follow plaintiff's second set of liquidation instructions (given on June 10, 2002) supports plaintiff's theory that Federico had no intention of fulfilling his promise to comply with plaintiff's liquidation instructions. Federico, instead, intended to wait for the market's downward spiral to reverse itself, as he allegedly explained when asked by plaintiff why he did not sell the Trust's shares. Moreover Federico does not allege any "intervening event" which prevented him from complying with plaintiff's instructions. Cf. Jacobs at § 12:24 ("Events taking place after defendant's intent was represented can be used as evidence in finding whether his representation was true when made. Thus, in the absence of an intervening event which could justify the defendant's change of heart, the more pronounced the alteration from the original intent and the shorter the period between the representation and the change, the stronger the inference that the original representation was false."). In sum the court finds a material fact issue on plaintiff's federal claim insofar as it is based on Federico's failure to comply *1166 with plaintiff's allegedly unambiguous instructions to sell the Trust's equity holdings.

C. Negligence, Fiduciary Duty, and Negligent Misrepresentation Claims
Plaintiff also asserts tort claims for negligence, breach of fiduciary duty, and negligent misrepresentation. In large part, the viability of these claims depends on the nature of Federico's discretion in carrying out his duties under SSB's brokerage agreement, which plaintiff signed.

(1) Nondiscretionary Nature of Agreement
As mentioned, plaintiff's agreement with SSB expressly provides that no SSB advisor or representative acts in a "discretionary capacity" with respect to the Trust's accounts. Thus, as plaintiff himself emphasized in a letter to Federico, Federico lacked "discretionary authority to make investments on behalf of the Trust." Plaintiff, however, argues that his agreement with Federico became discretionary by virtue of Federico's making independent investment decisions without regard for the agreement's nondiscretionary terms.
As a general matter, a stockbroker is an agent of his client. Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 769 F.2d 561, 567 (9th Cir.1985). A broker's agency authority, however, is narrowed when he or she acts pursuant to a nondiscretionary account agreement. Id. Essentially, "the agency relationship created by a non-discretionary account arises when the client places an order and terminates when the transaction ordered is complete." Id. And, importantly, a nondiscretionary "stockbroker assumes no continuing obligation to advise his clients of information that affects their securities." Id.; see also Berki v. Reynolds Secs., Inc., 277 Or. 335, 337-38, 342, 560 P.2d 282 (1977).
The court finds that no material fact issues exist regarding the nondiscretionary nature of the account. Plaintiff cites no case law in support of his suggestion that the account's nondiscretionary nature was transformed into a discretionary account. Under plaintiff's theory, anytime a broker breaches a nondiscretionary-account agreement a trader can then argue that the account was discretionary because the broker failed to comply with the agreement's terms. Thus, at least on this record, the court rejects plaintiff's attempt to re-characterize the nature of his agreement with SSB. Plaintiff may allege breach of contract or other claims, but those claims must be evaluated in light of the existence of the agreement's nondiscretionary nature.

(2) Plaintiff's Claims
Plaintiff's negligence and fiduciary-duty claims essentially depend on the same general allegations: (1) Federico formulated in February 2002 an investment proposal which failed adequately to consider plaintiff's concerns; (2) he ignored plaintiff's instructions to liquidate the Trust's equity holdings; (3) his unreasonable investment decisions, including the purchase of "dangerous" investments, caused the Trust's value to decline; and (4) he generally failed to inform plaintiff of material facts. As for plaintiff's negligent-misrepresentation claim, plaintiff does not identify any specific misrepresentations to support this claim; thus, this claim appears to be based, at least generally, on the above-listed allegations. Defendants argue that plaintiff cannot state negligence, negligent-misrepresentation, or fiduciary-duty claims because the parties' relationship is based on a contract.
*1167 Oregon courts have held that when the "parties' relationship arises out of a contract, plaintiff may bring a claim for negligence only if defendant is subject to a standard of care independent of the terms of the parties' contract." Moore Excavating, Inc. v. Consolidated Supply Co., 186 Or.App. 324, 332-33, 63 P.3d 592 (2003) (citing Georgetown Realty v. The Home Ins. Co., 313 Or. 97, 106, 831 P.2d 7 (1992)). State courts have developed two requirements which a plaintiff must meet to state tort claims for conduct that also allegedly supports a breach-of-contract claim:
[T]o bring a tort claim based on conduct that is also breach of a contract, a plaintiff must allege, first, that the defendant's conduct violated some standard of care that is not part of the defendant's explicit or implied contractual obligations; and, second, that the independent standard of care stems from a particular special relationship between the parties.
Strader v. Grange Mut. Ins. Co., 179 Or.App. 329, 333, 39 P.3d 903 (2002). Determining whether the applicable standard of care existed separate from the "contractual obligations" is not always an easy task.
The Oregon Supreme Court, however, has not left courts without guidance; the court has summarized the type of relationship which may support asserting tort claims despite the existence of the contractual relationship: A separate tort claim may exist when "one party has relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands." Conway v. Pacific Univ., 324 Or. 231, 240, 924 P.2d 818 (1996); see also Bennett v. Farmers Ins. Co. of Or., 332 Or. 138, 161-62, 26 P.3d 785 (Or.2001) (observing that key issue is "whether the nature of the parties' relationship itself allowed one party to exercise control in the first party's best interests ... [and] to exercise judgment on the other party's behalf" (emphasis in original)). The supreme court has further reasoned that to support tort liability, "a tort duty must exist 'independent of the contract and without reference to the specific terms of the contracts.'" Conway, 324 Or. at 237, 924 P.2d 818 (emphasis in original) (quoting Georgetown Realty, 313 Or. at 111, 831 P.2d 7).
Under Oregon law, the court concludes, plaintiff cannot maintain a negligence, breach-of-fiduciary-duty, or negligent-misrepresentation claim against defendants. Plaintiff claims defendants acted negligently and in breach of fiduciary duties during their performance of obligations established by the brokerage contract entered into by SSB and plaintiff. Plaintiff does not allege an applicable standard of care which was not part of defendants' "explicit or implied contractual obligations." Strader, 179 Or.App. at 333, 39 P.3d 903.
As a general matter, it is true that principal-agent relationships are "special" ones which generally support imposing separate tort liability. See generally Conway, 324 Or. at 240-41, 924 P.2d 818. But, in this case, as discussed supra, the court finds that plaintiff signed an account agreement sharply proscribing the exercise of independent judgment by SSB and Federico. Consistent with the brokerage agreement's express terms, plaintiff in fact expressly warned Federico against exercising discretion on plaintiff's behalf. Therefore, plaintiff, rather than defendants, had control over decisions regarding the Trust's investments, thus undermining plaintiff's position that a "special relationship" existed supporting his negligence, negligent-misrepresentation, and fiduciary-duty claims. See, e.g., Conway, 324 Or. at 240-41, 924 P.2d 818 (rejecting plaintiff's *1168 negligent-misrepresentation claim, which was related to an employment contract, because plaintiff-employee did not authorize his employer "to exercise independent judgment in his behalf" and thus the law could not impose a duty supporting such a claim); Berki, 277 Or. at 341-42, 560 P.2d 282 ("The plaintiff failed to prove any facts which would give rise to a fiduciary relationship between him and the defendants. The [brokerage] agreement was at best an agreement by the broker to buy and sell at the direction of plaintiff.").
Finally, it is notable that plaintiff's allegations, at least in part, turn on the assertion that Federico acted unreasonably by actually exercising discretion in making certain investment decisions, thereby disregarding the nondiscretionary brokerage agreement and plaintiff's instructions. Based on plaintiff's position, therefore, it is difficult to conclude that Federico's alleged breach of his duties existed apart from the "specific terms of the contract." Georgetown Realty, 313 Or. at 111, 831 P.2d 7 (observing there must be a tort duty "independent of the contract and without reference to the specific terms of the contract"); see also Conway, 324 Or. at 243 n. 7, 924 P.2d 818 ("`[I]f the alleged obligation to do or not to do something that was breached could not have existed but for a manifest intent, then contract law should be the only theory upon which liability would be imposed.'") (emphasis in original) (quoting W. Page Keeton, ed., The Law of Torts, § 92, at 656 (5th ed.1984)). In summary, the court finds that plaintiff cannot use Federico's alleged breach of his obligations to state claims for negligence, negligent misrepresentation, and breach of fiduciary duty.[3]

D. Common Law Fraud
To support his common law fraud claim, plaintiff relies on Federico's alleged failure to fulfill his promise to liquidate the Trust's equity holdings, the same argument he made in support of his Section 10(b) and Rule 10b-5 claim. Defendants argue: "As with his claim for violation of Section 10(b) ... Thompson's fraud claim is defective because the evidence does not show that Federico made a knowingly false statement or omission, or that he made a promise that he specifically intended not to perform. See Webb v. Clark, 274 Or. 387, 393 n. 2, 546 P.2d 1078 (1976) (`Fraud can never be predicated upon a promise to do something in the future unless it is alleged and proven that, at the time of the making of the promise, there was no present intention of performance or, alternatively, that the promise was made with reckless disregard as to whether the promissor could or could not perform.')." Thus defendants make the same argument against the common law fraud claim as they made against the federal securities law claim. As a result, for the reasons discussed supra, the court denies summary judgment as to plaintiff's common law fraud claim insofar as that claim depends on Federico's alleged broken promises to liquidate the Trust's equity holdings.

E. Breach of Contract
Plaintiff's breach-of-contract claim is based on Federico's failure to comply with plaintiff's instructions to sell the Trust's equity holdings. Plaintiff alleges that Federico's conduct breached the parties' agreement which, as a nondiscretionary account, made it clear that Federico *1169 was obligated to follow plaintiff's investment instructions. Defendants' response relies on the allegedly ambiguous terms of plaintiff's June 12 letter, in which plaintiff instructed Federico to sell "some positions." According to defendants, there can be no breach for failing to liquidate when plaintiff told Federico to sell only "some" of the Trust's holdings.
But reading the record in plaintiff's favor gives rise to material issues of fact regarding whether plaintiff clearly instructed Federico to sell all the Trust's equity holdings. See supra. Plaintiff's affidavit and Nicholls' testimony state that plaintiff gave Federico unambiguous instructions to liquidate the holdings. In addition, the June 12 letter's reference to "some positions," while ambiguous, can be read consistently with plaintiff's contention that "some positions" meant the equity holdings as distinguished from the cash and bond holdings. In light of the parties' understanding that the brokerage contract prevented Federico from acting in a discretionary capacity, there are material issues of fact as to whether his failure to follow plaintiff's instructions breached the brokerage contract.[4]

F. Unlawful Trade Practices Act
Plaintiff asserts one state statutory claim for alleged unlawful trade practices in violation of ORS 646.608(1)(k). That statutory provision provides that it is unlawful for a business person to make "false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred." Id. Plaintiff's complaint does not make it clear exactly what he claims violated this statute. In his briefing, however, plaintiff makes the following allegations to support his statutory claim: (a) Federico's failure to follow plaintiff's liquidation instructions, (b) defendants' failure to inform plaintiff that some of Federico's investments would be improperly influenced by other divisions of SSB, and (c) defendants' failure to reveal to plaintiff the "full nature" of the transactions and obligations incurred.
The court finds no material issues preventing summary judgment on this claim. As an initial point, plaintiff does not cite any authority which would support the application of the cited statutory provision to brokerage services such as those at issue here. Indeed plaintiff does not cite any authority. In any event, plaintiff does not allege any misrepresentations regarding "credit availability." As for plaintiff's allegation Federico failed to follow plaintiff's liquidation instructions, plaintiff does not explain how Federico's failure involved any misrepresentation regarding the "nature of the transaction or obligation incurred." Instead, plaintiff's allegation, at bottom, is that Federico made promises he did not keep in breach of the brokerage agreement and supporting fraud claims. There is no suggestion, however, that Federico misrepresented the meaning or terms of the brokerage agreement in such a way as to affect plaintiff's understanding of the parties' rights or obligations established by the brokerage relationship. Cf, e.g., State ex rel. Redden v. Willamette Recreation, Inc., 54 Or.App. 156, 159-60, 634 P.2d 286 (1981) (holding plaintiff had claim under ORS 646.608(1)(k) where defendant falsely explained meaning of a contractual provision in such a way as to induce plaintiff to *1170 enter car-purchase agreement); Tri West Constr. Co. v. Hernandez, 43 Or.App. 961, 964, 972, 607 P.2d 1375 (1979) (holding plaintiff had claim under subsection (1)(k) where construction company falsely told plaintiffs they did not have authority to rescind an unwanted home-improvements contract, thereby leading plaintiffs to believe they "had no right at all to cancel" the contract).
Thus, given plaintiff's lack of elaboration and citation to authority, the court refuses to apply the statute to Federico's alleged broken promises. The court also declines to apply the statute to plaintiff's other two cursory allegations regarding defendants' alleged use of "other divisions" at SSB and failure to disclose the "full nature" of Federico's transactions. Plaintiff does not cite to any evidence supporting these allegations or more specifically explain these otherwise bald allegations.[5]

G. Punitive Damages
Defendants also move for summary judgment against plaintiff's request for punitive damages under Oregon law, arguing that there is insufficient evidence of the degree of culpability required to impose punitive damages. In response, plaintiffs rely on SSB's past troubles involving investments in companies including Worldcom.
As defendants correctly point out, "imposition of punitive damages [requires] a degree of culpability greater than inattention or simple negligence." Badger v. Paulson Inv. Co., 311 Or. 14, 28, 803 P.2d 1178 (1991). Rather, to recover punitive damages, ORS 31.730 provides that the plaintiff must offer proof of malice or "reckless and outrageous indifference to a highly unreasonable risk of harm, and that defendant acted with a conscious indifference to the health, safety, and welfare of others." Clausen v. M/V NEW CARISSA, 171 F.Supp.2d 1127, 1131 (D.Or.2001) (emphasis in original) (discussing ORS 31.730), aff'd, 339 F.3d 1049 (9th Cir.2003). Moreover the evidentiary standard governing a punitive-damages request under Oregon law is more rigorous than the standard governing the analysis of the underlying substantive claims: Punitive damages are not recoverable unless ORS 31.730's required elements are shown "by clear and convincing evidence." ORS 31.730(1). Evidence qualifies as "clear and convincing" when the "`truth of the facts asserted is highly probable.'" Simpson v. Burrows, 90 F.Supp.2d 1108, 1130 (D.Or.2000) (emphasis added) (quoting In re Blaylock, 328 Or. 409, 411, 978 P.2d 381 (1999)).
In resolving defendants' motion for summary judgment, therefore, the court must view the claim for punitive damages through the lens of the standard of clear and convincing evidence. Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."); see, e.g., Clausen, 171 F.Supp.2d at 1131 (refusing to allow plaintiff to amend complaint's prayer to seek punitive damages because the evidence proffered in favor of amendment could not "meet the clear and convincing standard"); Hubka v. Paul Revere Life Ins. Co., 215 F.Supp.2d 1089, 1094 (S.D.Cal.2002) (observing that to defeat summary judgment on state law claim for punitive damages, "Plaintiff must produce evidence such that a reasonable juror could find punitive damages appropriate by clear and convincing evidence").
*1171 As the court held above, summary judgment is denied with regard to plaintiff's federal and common law fraud claims. Nevertheless, under the particular circumstances presented, the court finds it appropriate to grant summary judgment against plaintiff's claim for punitive damages brought under ORS 31.730. First, in response to defendants' summary judgment motion as to punitive damages, plaintiff relies solely on SSB's alleged history of "dangerous" investments and SEC investigations of SSB. But the surviving fraud claims depend entirely on Federico's alleged broken promises to liquidate the Trust's holdings. The sole question, therefore, is whether there is sufficient evidence associated with the alleged broken promises so as to justify denying defendants' motion for summary judgment as to punitive damages. Defendants argue that plaintiff's June 12 letter could be read to contradict plaintiff's alleged oral instructions to liquidate; in which event, defendants contend, plaintiff cannot show the requisite degree of culpability to support an award of punitive damages. Despite his burden to respond to summary judgment by coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), plaintiff fails even to argue that there is clear and convincing evidence that punitive damages are appropriate with regard to Federico's alleged promissory fraud. It is, therefore, difficult for the court to make an argument on plaintiff's behalf in favor of a punitive-damages award.
In any event, reading the record in plaintiff's favor, the court cannot say there is "clear and convincing" evidence that Federico acted "with conscious indifference" to the Trust's welfare. See ORS 31.730. Even under plaintiff's version of events, Federico failed to sell the Trust's equity holdings because he was waiting for an upturn in the market, which never occurred. Thus it appears that Federico failed to act, at least in part, because he felt he knew better than plaintiff what course of action was best for the Trust's welfare. At oral argument, plaintiff suggested that Federico failed to sell the Trust's equity holdings in an effort to enrich his personal compensation. According to plaintiff's oral argument, Federico's compensation is slightly higher when he manages stock, as opposed to cash. But even plaintiff's calculation of the difference in compensation shows the difference, if any, is inconsequential. Defendants contended that Federico's compensation would have remained unchanged regardless of whether he sold the Trust's stock holdings. Given plaintiff's failure to make a persuasive showing that Federico's decisions would materially affect his individual financial situation, the court declines to give weight to that theory.
In summary, as held above, Federico's alleged promissory fraud satisfies the substantive elements of plaintiff's fraud-based claims. But, especially given the heightened burden of proof, more must be shown to justify an award of punitive damages. Plaintiff has failed to show it is "highly probable" Federico acted with a "conscious disregard" for plaintiff's or the Trust's welfare.

IV. PLAINTIFF'S CROSS-MOTION
Plaintiff asserts that defendants have wrongfully retained control of approximately $14,000.00 worth of assets. With respect to the retained assets, plaintiff seeks summary judgment for breach of contract and fiduciary duty, as well as for violation of the Oregon Unfair Trade Practices Act. Defendants admit such assets remain in their control, but deny they wrongfully possess them.

A. Local Rule 7.1(a)(1)
Defendants first argue that plaintiff's motion should be denied because *1172 plaintiff's counsel failed to comply with Local Rule 7.1. Because the situation presented here is precisely the type of situation for which that rule was enacted, the court discusses this issue briefly.
Local Rule 7.1(a)(1) requires a party filing a motion to certify that the "parties made a good faith effort through personal or telephone conferences to resolve the dispute, and have been unable to do so; or [t]he opposing party willfully refused to confer." If the rule is to mean anything at all, at least the spirit of its substantive requirements must be met. The obvious purpose of Local Rule 7.1 is to encourage parties to resolve amicably disputes when possible, preserving judicial resources for those matters that require the court's intervention.
Based on defendants' unrebutted evidence, the court concludes plaintiff failed to comply with the requirements of Rule 7.1(a)(1). Mr. Campbell's Declaration and attached letters demonstrate that plaintiff ignored defendants' repeated attempts to resolve this issue without involving the court. Indeed defendants state they have been ready and willing to transfer the retained assets. Plaintiff, therefore, had ample opportunity to resolve this relatively minor and admittedly "narrow issue" (Plaintiff's Motion for Partial Summary Judgment at 2) that is only tangentially related to plaintiff's pleadings. Plaintiff fails to explain, and the court fails to see, how giving less than one day's notice of a summary judgment motion and rebuffing two prompt offers of simple resolution constitute a good faith attempt to resolve the dispute. Under these circumstances, the court believes it is appropriate to deny plaintiff's motion for failure to comply with the Local Rules' meet-and-confer provision.

B. Plaintiff's Claims
In any event, even considering the merits of plaintiff's motion, it should be denied. Plaintiff premises his claims regarding the $14,000 in assets on the allegation defendants received instructions to transfer all assets to plaintiff's new broker and defendants inexcusably failed to comply with those instructions. Plaintiff's claims also rely on the assertion defendants failed to respond to plaintiff's inquiries about the missing assets.
The parties have provided conflicting evidence regarding plaintiff's original instructions to transfer the assets. While plaintiff asserts that the instructions were unequivocal and defendants thus unjustifiably disobeyed them, defendants allege the instructions were reasonably followed. In addition, plaintiff and defendants offer conflicting evidence about whether plaintiff inquired about the remaining assets between August 2002 and March 2004. To rebut plaintiff's assertions of misrepresentation, defendants have offered an explanation as to why the funds were not transferred: the assets in question were tied up in a Chapter 11 reorganization and unavailable for transfer at the time.
A reasonable juror could conclude that defendants' actions were consistent with plaintiff's transfer instructions. Jurors could find that plaintiff either did not inquire about the $14,000 in assets prior to March 2004 or his inquires were not rebuffed, and also that defendants made no misleading statements or omissions regarding those assets. Thus, given that the factual predicate underlying plaintiff's motion is disputed, summary judgment is not appropriate.[6]

*1173 V. CONCLUSION
For the foregoing reasons, the court DENIES plaintiff's motion for partial summary judgment. (Doc. # 33) The court GRANTS in part and DENIES in part defendants' motion for summary judgment. (Doc. # 40). The court denies summary judgment as to plaintiff's breach-of-contract claim, given the parties' conflicting stories. The court additionally concludes that there is sufficient, although not overwhelming, evidence to create triable issues on plaintiff's securities and common law fraud claims. But, the evidence falls short of satisfying the more rigorous standard applicable to plaintiff's claim for punitive damages. The court, therefore, grants summary judgment against plaintiff's claim for punitive damages. In addition, the court grants defendants' motion in all other respects, as discussed above.
IT IS SO ORDERED.
NOTES
[1] Defendants filed a motion to strike plaintiff's affidavit, arguing that the court should not accept plaintiff's affidavit because it was filed late in violation of the court's scheduling order and local rule provisions. The court rejects defendants' contention.

First, Federal Rule of Civil Procedure 56(c) provides that a movant may prior to the day scheduled for a hearing "serve opposing affidavits." Fed.R.Civ.P. 56(c). Defendants emphasize that the Ninth Circuit, in Marshall v. Gates, 44 F.3d 722, 725 (9th Cir.1995), recognized that Rule 56(c)'s safe harbor for filing affidavits may properly be limited by a local rule. While the court did use language to that effect, it specifically held in favor of the party who had failed to comply with a local rule, reasoning in part that the court's precedent made it improper effectively "to grant summary judgment as a sanction for the late filing" of affidavits. Id. at 725. In any event, the Local Rule cited by defendants does not specifically require a party to file affidavits only with his or her summary judgment response, as defendants suggest. In addition, the court bears in mind the federal rules' policy in favor of resolving cases on their merits. Nor have defendants identified any actual prejudice from the filing of the affidavit, which would be difficult to do given that plaintiff expressly stated he did not oppose defendants' filing any responsive evidence.
Defendants further object to the court's consideration of the exhibits attached to plaintiff's affidavit, particularly the deposition testimony of Garth Nicholls. The court will consider Nicholls' testimony, especially given that defendants' counsel conducted the deposition. Defendants thus cannot claim surprise as they had an opportunity in examining him to challenge Nicholls' version of events.
[2] Specifically, Federico emphasized that there were "several positive [economic] indicators such as improving consumption, increasing productivity, low interest rates, increasing housing investments, and subdued inflation." While noting several other more negative economic indicators, Federico warned Thompson, "those who let market direction dictate their behavior about their investments have always had disastrous results."
[3] As a result, plaintiff does not state a viable claim based on the allegedly "dangerous" investments purchased through SSB, given that plaintiff connects his dangerous-investment allegations only to his negligence and fiduciary-duty claims. The court, therefore, need not separately consider the parties' arguments regarding the El Paso and Worldcom investments, allegedly dangerous investments Federico purchased while he was with SSB.
[4] The court again notes the important difference between the breach-of-contract claim and the claims based on promissory fraud, discussed supra. Plaintiff may still show breach of contract even if Federico decided to disregard plaintiff's instructions after Federico made the alleged promises to liquidate the equity holdings. But, to show promissory fraud, plaintiff must prove that Federico did not intend to fulfill his alleged promises at the time he made the promises.
[5] The court is particularly puzzled by the allegation regarding the use of "other divisions of SSB," given that plaintiff himself in February 2002 expressly told Federico to consult with other experts at SSB in formulating a new investment proposal.
[6] The court notes that defendants do not brief whether or not plaintiff's trade-practices and fiduciary-duty claims fail for the same reasons argued in defendants' motion for summary judgment. Given that defendants' failure to transfer assets to Paine Webber involves a different set of circumstances as those briefed in defendants' motion, the court does not at this time determine whether plaintiff's trade-practices and fiduciary-duty claims related to the $14,000 transfer fail for the reasons the court discussed supra.