Argued February 10, affirmed February 25, 1977

# BERKI, *Appellant,*
## *v.*
# REYNOLDS SECURITIES, INC. et al, *Respondents.*
## (No. 413-354, SC 24453)
560 P2d 282

Ridgway K. Foley, Jr., Portland, argued the cause for appellant. With him on the briefs were Souther, Spaulding, Kinsey, Williamson & Schwabe and Mark H. Wagner, Portland.

Paul R. Duden, Portland, argued the cause for respondent Reynolds Securities, Inc., a Delaware corporation. With him on the brief were Tooze, Kerr, Peterson, Marshall & Shenker, Portland.

George VanNatta, St. Helens, argued the cause for respondent Joseph C. Thompson, an individual. With him on the brief were VanNatta and Petersen, St. Helens.

Before Denecke, Chief Justice, and Holman, Lent and Mengler, Justices.

MENGLER, Justice Pro Tempore.

**MENGLER, J.,** Pro Tempore.

This is an appeal from a judgment of involuntary nonsuit.

The complaint was in three counts: (1) common law fraud, (2) violation of the Oregon Securities Law, and (3) breach of a fiduciary obligation.

At the close of the plaintiff's case in chief, the court allowed defendants' motions for involuntary nonsuit.

■ A party appealing from an order of involuntary nonsuit is entitled to have the evidence viewed in a manner most favorable to him. In reviewing the sufficiency of the evidence, this court is required to assume the truth of the evidence offered and to give the plaintiff benefit of all reasonable inferences from the evidence. *Howard v. Sloan,* 264 Or 247, 504 P2d 735 (1972).

The plaintiff, age 27, except for writing his thesis, had completed the requirements for a master's degree in electrical engineering. He had prior experience with the stock market, and had taken one or more courses on the stock market including lectures on option trading. In July 1973 plaintiff opened a cash account with defendant Thompson, an agent of Dominick & Dominick, stock brokers. The conditions of the agreement were: (1) that the plaintiff did not want defendant Thompson to exercise judgment in holding stocks, because the plaintiff had previously suffered losses in the market when he relied on the judgment of a broker; and (2) that whenever an individual stock dropped to 80 percent of its purchase value, the broker was to notify plaintiff, who would make a decision. Plaintiff was also to make the decisions on purchases.

The complaint alleges that the parties had agreed that plaintiff's investment would be protected to the extent that if any stock in which the defendants invested plaintiff's money dropped below 80 percent of its value at time of purchase, it would be immediately sold.

In August 1973 Dominick & Dominick closed its Portland office. Defendant Thompson became employed by defendant Reynolds Investment Securities, Inc. The plaintiff by written agreements opened two accounts with defendant Reynolds, through defendant Thompson, who had become their employe. The first account was a margin account and the second an option trading account.

The written agreements provided in part as follows:

"(10) Reports of the execution of orders and statements of my accounts shall be conclusive if not objected to in writing, the former within two days, and the latter within ten days after transmittal to me by mail or otherwise.

"* * * I am well aware that option future trading is highly speculative in nature. I am also aware that on certain trading days trading may cease and this may result in financial disadvantage to me. I agree to hold Reynolds Securities, Inc. harmless for such losses.

"I understand that Reynolds Securities, Inc. maintains a policy whereby Account Executives may neither exercise discretion nor manage any account nor hold a power of attorney over any account.

"I agree that I am responsible for making all final decisions as to transactions effected in this account and understand each order I enter to buy or sell must be complete as to security, quantity, price and duration of the order.

"I am willing and able to assume the financial risks and hazards of option trading, and in consideration of your carrying this account for me, I agree that I will in no way hold Reynolds Securities, Inc. responsible for losses incurred through following your trading recommendations or suggestions offered to me in good faith by your representative."

The plaintiff read and signed the written agreements.

The question before this court is by accepting the truth of the evidence and giving plaintiff benefit of all reasonable inferences, whether there was any evidence of common law fraud, violation of the Oregon Securities Law or a breach of fiduciary obligation

sufficient to submit to the jury. During a period from July 1973 to October 1974, the plaintiff invested approximately $10,000 with the defendants. Approximately $2,700 was paid in commissions. The remainder was lost in the market.

During the period from July 1973 to October 1974, the plaintiff received approximately 75 buy or sell confirmations and regular monthly statements. The monthly statements gave the balance forwarded from the prior month, and set out all new transactions. These statements provided the plaintiff with all the information necessary to determine what stocks he held. By referring to the stock quotations in a daily newspaper, he could identify any stock which had fallen below 80 percent of its purchase value. Additionally, the defendant Thompson testified that, with two exceptions, he had notified plaintiff each time that a held stock dropped to 80 percent of its purchase value.

The plaintiff by his margin account agreement was required to keep the account properly margined at 50 percent, as then required by the Standards of the Federal Reserve Board.

The plaintiff first alleges that the trial court erred in granting an involuntary nonsuit on the first count in common law fraud. He relies upon misrepresentations made to him of the status of the account. One alleged misrepresentation was to the effect that plaintiff's investment was "fine" and that the agreement with respect to protecting 80 percent of the investments was being honored. Another was that "everything is fine. We are winning some, losing some, but we are hanging right in there." The testimony shows that other representations of like import were made from time to time.

There is no evidence that the statements made were false when made. The record shows that the account made gains and losses. There is no evidence that at the time the statements were made the account was

losing, or, if it was, that the plaintiff had not been so informed by the confirmations or monthly statements, or by the defendants.

The plaintiff's brief alleges that defendants "specifically misrepresented to the plaintiffs the status of his account on those numerous occasions when he inquired about it." The plaintiff's testimony is contrary:

"Q   Do you know of any stock which was going down when Joe [defendant Thompson] told you it was going up or vice versa?
"A   No."

There is no evidence that the defendants misrepresented that they were complying with the provision of the agreement that a listed stock was to be sold immediately if it fell below 80 percent of its purchase value. This is supported by the plaintiff's testimony:

"Q   And during that same period of time did Mr. Thompson make any representations to you about adherence to this eighty percent limitation that you placed on him?
"A   Yes. I—a couple of times like I said that I would have an opportunity to see a stock in the paper, that I saw go to that level, I would then go hit him up with that and he would take the necessary action * * *."

One who had even the most elementary knowledge of the stock market would know that under an agreement to sell a stock immediately when it fell to below 80 percent of its purchase value would occasionally, if not frequently, result in more than a 20 percent loss by the time the sale was completed. Further, it is elementary that this process of selling would, after a few sales, deplete an account.

There is no evidence in the record that the plaintiff ever requested the defendants to apply the 80 percent agreement to his margin or call option accounts. Plaintiff's theory is that the 80 percent agreement, which was made before the margin and call option accounts were opened, was applicable to them. The evidence does not support this theory, but even if it

did, and it was applied to the margin account, losses could not be held to 20 percent because 50 percent of the purchase money was borrowed. The plaintiff's account therefore suffered at least a 40 percent loss— 20 percent in his money and 20 percent of the borrowed money.

The evidence shows that a call option account is a definite right, or option, to buy a corporate stock at a specific, or "striking" price within a limited period of time. There is no evidence that the plaintiff ever asked, or directed, the defendant to apply the 80 percent agreement to the call option account, or that if it were attempted, it would have been workable and prevented a loss.

The court finds that there was no evidence to support the first element of fraud that a false representation was made. The trial court properly allowed the motion for an involuntary nonsuit with respect to the plaintiff's first cause of action.

The thrust of the allegation in the complaint as to the second count is that the defendants employed a device, scheme, or artifice to defraud plaintiff by continually misrepresenting the status of plaintiff's account to him. For the reasons heretofore stated under the first assignment of error, this court finds that there was no evidence from which the jury could find that the defendants violated ORS 59.135, the Oregon Securities Law. The trial court properly allowed a motion of involuntary nonsuit as to the second count.

The plaintiff alleges as his third assignment of error that the trial court erred in granting an involuntary nonsuit as to the allegation that defendants breached a fiduciary relationship with plaintiff.

The written agreements between plaintiff and defendants state specifically that the defendants could neither exercise discretion over the accounts nor manage them. Further, the agreements provided that

plaintiff would hold defendants harmless for any losses incurred. The plaintiff testified that he was not going to entrust to the broker the judgment of how he should hold something which was going down.

■■ The plaintiff failed to prove any facts which would give rise to a fiduciary relationship between him and the defendants. The agreement was at best an agreement by the broker to buy and sell at the direction of the plaintiff. A stockbroker acting as here is not a fiduciary. A broker's duty is complete and his authority ceases when a purchase or sale in accordance with the agreement is made and he has fully accounted. *Pac. Trading Co. v. Sun Ins. Office,* 140 Or 314, 319, 13 P2d 616 (1932).

This court finds that there is no evidence to support a finding that a fiduciary relationship existed between the parties. The trial court properly allowed the motion for an involuntary nonsuit as to the third account.

Affirmed.