Kenneth A. CARR, Plaintiff–Appellant,

v.

CIGNA SECURITIES, INC., and Cigna Individual Financial Services Co., Defendants–Appellees.

No. 95–4006.

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1996.

Decided Sept. 6, 1996.

Barbee B. Lyon and Scott G. Seidman (argued), Tonkon, Torp, Galen, Marmaduke & Booth, Portland, OR, for plaintiff–appellant.

Keith F. Bode, Ellen R. Kordik, C. John Koch, J. Kevin McCall (argued), Jenner & Block, Chicago, IL and James C. Carter, Schulte, Anderson, Defrancq, Downes & Carter, Portland, OR, for defendants–appellees.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

POSNER, Chief Judge.

Kenneth Carr was a professional basketball player when in 1984 he paid CIGNA Financial Advisors, Inc. (as the affiliated defendants are now known) $450,000 for limited-partner interests in two commercial real estate limited partnerships that CIGNA had created. Carr sued in 1993 under Rule 10b–5 of the Securities and Exchange Commission and the common law of Oregon, charging that the salesman with whom he had dealt had told him that the limited partnerships were safe, conservative investments, whereas the opposite was true—and indeed he lost every penny of his investment when the commercial real estate market collapsed in the late 1980s. Carr acknowledges that the salesman gave him documents that disclosed the riskiness of the investment, but he says that the salesman "knew that I didn't understand them. He said they were boilerplate kind of stuff, and breezed through them. He just explained them in his own words. He didn't say they were contrary to what he had told me. What I understood was what he told me." Carr did not read the documents.

The suit was filed in an Oregon state court, removed to the federal district court in Oregon, then transferred for pretrial proceedings to the Northern District of Illinois by the Judicial Panel on Multidistrict Litigation and dismissed by Judge Zagel as barred by the statute of limitations.

Actually Carr had brought two suits; and this is more than a detail. He was one of thirty plaintiffs who had joined together in a materially identical suit against CIGNA in 1991 (the *Corkery* suit). Judge Zagel dismissed that suit on the same ground, and on the same day, as the present suit. Neither Carr nor any of the other plaintiffs appealed the judgment in *Corkery*. CIGNA argues that the judgment is res judicata in the present suit, so that we can affirm without reaching the merits. It is true that a judgment need not be appealed in order to operate as a bar—need not even have become final, through exhaustion of appellate remedies (though this one had), provided that it was final in the court that rendered it. *Williams v. Commissioner*, 1 F.3d 502, 504 (7th Cir.1993); *Dickie v. City of Tomah*, 999 F.2d 252, 254 (7th Cir.1993). It is also true that the barred suit could be a suit that had been filed before the suit in which the preclusive judgment is entered. 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4404, p. 23 (1981). The question here, however, is whether the judgment can kill the *appeal* from the judgment in the other suit. The Wright and Miller treatise answers with a rather hesitant "yes," 18 Wright, Miller & Cooper, § 4433, p. 314, but the case law, including the case law of this circuit, answers, we think correctly, "no." *Freeman United Coal Mining Co. v. Office of Workers' Compensation Program*, 20 F.3d 289, 294 (7th Cir.1994); *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir.1994); *Cycles, Ltd. v. Navistar Financial Corp.*, 37 F.3d 1088, 1091 (5th Cir.1994); *Priddy v. Edelman*, 883 F.2d 438, 442 (6th Cir.1989); *Flood v. Harrington*, 532 F.2d 1248, 1250 (9th Cir.1976). The only effect of allowing res judicata to be pleaded in this situation would be to incite a second, and useless, appeal; for no one supposes that if Carr had appealed both judgments either one could have been used to block the appeal from the other. His failure to appeal the judgment in the Corkery suit did not mislead or otherwise harm CIGNA. CIGNA knew that Carr was challenging the judgment dismissing his current claim, which subsumed the claim he had made in *Corkery*. Should he prevail on this appeal, he could not seek to reopen *Corkery*. It is true that when he brought his own suit in 1993, he should have dropped out of the *Corkery* suit. The reason he did not, apparently, is that he was represented by separate counsel in the two suits. This is not a situation to be encouraged, but the use of the unappealed dismissal to defeat Carr's right of appeal would be an excessive sanction. Cf. *Okaw Drainage District v. National Distillers & Chemical Corp.*, 882 F.2d 1241, 1248 (7th Cir.1989).

Another threshold question is whether Judge Zagel, having dismissed Carr's federal claim before trial, should have relinquished Carr's state law claim. The general rule, when the federal claims fall out before trial, is that the judge should relinquish jurisdiction over any supplemental (what used to be called "pendent") state law claims in order to minimize federal judicial intrusion into matters purely of state law. 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). There are a number of exceptions, *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251–52 (7th Cir.1994), but the only candidate for one in this case is that the case was transferred from another district. If Judge Zagel relinquished jurisdiction, the parties would go back to the Oregon state court where this suit started. Since, however, all that would be left in the case is a claim under Oregon law, and since the plaintiff is a resident of that state and CIGNA can be served there, it is a little hard to see why that would be an untoward consequence. But we must ask *why* the case was transferred. Ordinarily a case is transferred from a less to a more convenient forum, implying that a retransfer would impose a net inconvenience on the parties. That in itself is some reason for retaining federal jurisdiction. This was one of a number of cases against CIGNA arising from the ill-fated limited partnerships, and all were consolidated in the federal district court in Chicago for pretrial matters, including dispositive motions on substantive issues, which might include issues of state law. There are considerable judicial economies in having one judge in one court dispose of all pretrial matters in all these cases, and they may outweigh the interest in permitting Oregon courts to decide

questions of Oregon law in cases that have lost their federal jurisdictional handle. However this may be, it is apparent that the parties are of diverse citizenship (though this is not alleged as a basis for federal jurisdiction), so we need not decide the appropriateness of retaining jurisdiction over a state law claim under the supplemental jurisdiction of the federal courts in a case transferred by the multidistrict panel—an issue on which we cannot find any previous cases to guide us.

■ We are going to skip over the tangled statutes of limitations issues, which are similar to ones we discussed at rather exhausting length recently in *Wolin v. Smith Barney Inc.*, 83 F.3d 847 (7th Cir.1996), and come directly to the merits of the fraud claims, which CIGNA sensibly argues as an alternative ground for affirming the judgment in its favor. The claims are barred by a very simple, very basic, very sensible principle of the law of fraud, both the law of securities fraud and the common law of fraud. If a literate, competent adult is given a document that in readable and comprehensible prose says X (X might be, "this is a risky investment"), and the person who hands it to him tells him, orally, not-X ("this is a safe investment"), our literate, competent adult cannot maintain an action for fraud against the issuer of the document. E.g., *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 571 (7th Cir.1991); *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir.1988); *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 416 (1st Cir.1989); *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1518 (10th Cir.1983); *Knappenberger v. Cascade Ins. Co.*, 259 Or. 392, 487 P.2d 80, 83 (1971); contra, *Bruschi v. Brown*, 876 F.2d 1526, 1529 (11th Cir.1989). This principle is necessary to provide sellers of goods and services, including investments, with a safe harbor against groundless, or at least indeterminate, claims of fraud by their customers. Without such a principle, sellers would have no protection against plausible liars and gullible jurors. The sale of risky investments would be itself a very risky enterprise—a very *legally* risky enterprise. Risky investments by definition often fizzle, and an investor who loses money is a prime candidate for a suit to recover it. If the

documents he was given, warning him in capitals and bold face that it was a **RISKY** investment, do not preclude the suit, it will simply be his word against the seller's concerning the content of an unrecorded conversation.

■ Carr was a fully literate, fully competent adult investing $450,000, which even to an NBA player is not such chicken feed that a busy person could not realistically be expected to take the time to read a lot of fine-print legal mumbo-jumbo. Carr points out that he is not, or at least was not in 1984, a sophisticated investor, knowledgeable about limited partnerships or commercial real estate. He argues that CIGNA's salesman invited him to repose trust in the salesman's advice and by doing so created a fiduciary relationship. The general rule, however, is that a broker is not the fiduciary of his customer unless the customer entrusts him with discretion to select the customer's investments, which Carr did not do. *CFTC v. Heritage Capital Advisory Services, Ltd.*, 823 F.2d 171, 173 (7th Cir.1987); *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 371–72 (7th Cir.1978). Carr argues that Oregon (like Illinois, see *Burdett v. Miller*, 957 F.2d 1375, 1381–82 (7th Cir.1992)) takes a more liberal approach. We do not think so, see *Berki v. Reynolds Securities, Inc.*, 277 Or. 335, 560 P.2d 282, 286 (1977); *Wallace v. Hinkle Northwest, Inc.*, 79 Or.App. 177, 717 P.2d 1280, 1282 (1986); but see *Pincetich v. Jeanfreau*, 699 F.Supp. 1469, 1476 (D.Or. 1988), but it hardly matters. A fiduciary relationship places on the fiduciary a duty of candor, and concomitantly excuses the principal from having to take the same degree of care that is expected of a participant in an arm's length contractual relationship. *United States National Bank v. Guiss*, 214 Or. 563, 331 P.2d 865, 876 (1958); *Maksym v. Loesch*, 937 F.2d 1237, 1242 (7th Cir.1991); Donald C. Langevoort, "Fraud and Deception by Securities Professionals," 61 Tex. L.Rev. 1247, 1254 (1983); cf. *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149, 843 P.2d 890, 898 (1992). But provided that the fiduciary's principal is a competent adult, the fiduciary relationship does not excuse the principal from taking the most elementary

precautions against a salesman's pitch, such as the precaution of reading a short and plain statement of what one is buying for one's $450,000.

We do not say that a written disclaimer provides a safe harbor in every fiduciary case. Not all principals of fiduciaries are competent adults; not all disclaimers are clear; and the relationship may involve such a degree of trust invited by and reasonably reposed in the fiduciary as to dispel any duty of self-protection by the principal. But we are dealing here with a case in which, if there is a fiduciary duty imposed by state law—and probably there is not—it lies at the outer limits of the fiduciary principle, for it is a duty laid on a broker to whom his client has not even delegated the selection of the investments for the client's account. In so attenuated a fiduciary relation (cf. *In re Woldman*, 92 F.3d 546 (7th Cir.1996)), and with so much money at stake, the principal has a duty to read. See *Burdett v. Miller*, supra, 957 F.2d at 1381.

Picking up on one of the qualifications in the preceding paragraph, Carr points out that CIGNA handed him 427 pages of documents when he bought the shares of the limited partnerships. We agree that it would be unreasonable to expect Carr to pore through 427 pages of legal and accounting mumbo-jumbo looking for nuggets of intelligible warnings. But the subscription agreements for each of the limited partnerships were only eight pages long and rich in lucid warnings, such as: "the Units [the limited-partner interests that he was buying] are speculative investments which involve a high degree of risk of loss by the undersigned of his entire investment in the Partnership."

Professional athletes, like other wealthy but financially unsophisticated people, may be a common prey of financial predators. See, e.g., Kent Somers, "The Color of Money: Athletes Often Fall Victim to Bad Financial Moves," *Arizona Republic*, Aug. 23, 1992, p. D1; Mark Herman, "It's Not All the Money in the World After All: Athletes Find Financial Complacency Can Lead to Bankruptcy, at Any Salary," *Plain Dealer*, Nov. 8, 1994, p. 5D; Clifford Carlsen, "Faust Steps into the Batter's Box for Financial Troubles of Athletes," *San Francisco Business Times*, Aug. 21, 1989, p. 12; Roger Lowenstein, "Many Successful Athletes Suffer Setbacks in Business," *Wall St. J.*, Jan. 27, 1987, p. 37. But their vulnerability does not justify a rule that would have the effect of making financial advisors the guarantors of risky investments.

AFFIRMED.