Argued and submitted August 24, 2005; resubmitted en banc April 11,
affirmed by equally divided court June 27, petition for review allowed
November 21, 2007 (343 Or 467)

Robert J. BOYER,
*Plaintiff-Appellant,*

*v.*

SALOMON SMITH BARNEY,
a Delaware corporation;
Dean Michael Howell;
and Dean K. Morrell,
*Defendants-Respondents.*

Multnomah County Circuit Court
021212721; A123799

162 P3d 1016

George W. Kelly argued the cause and filed the briefs for appellant.

Bruce L. Campbell argued the cause for respondents. With him on the brief was Miller Nash LLP.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, and Sercombe, Judges, and Murphy, Judge pro tempore.

PER CURIAM

Armstrong, J., concurring.

Edmonds, J., dissenting.

**ARMSTRONG, J.**, concurring.

Plaintiff appeals a judgment on the pleadings that dismissed his negligence claim against Salomon Smith Barney and two of its employees, Howell and Morell, for conduct related to commodity trading services. ORCP 21 B. On review, our task is to determine whether the pleadings establish that plaintiff cannot prevail on his negligence claim against defendants. *Withers v. State of Oregon*, 133 Or App 377, 382, 891 P2d 675, *rev den*, 321 Or 284 (1995).

When a claim is resolved against a plaintiff on the pleadings, we accept as true the well-pleaded allegations of fact in the pleadings, *Slogowski v. Lyness*, 324 Or 436, 439, 927 P2d 587 (1996), with all inferences drawn favorably to the plaintiff. *Rexius Forest By-Products v. A & R Lumber Sales*, 112 Or App 114, 118, 827 P2d 1359 (1992).

Plaintiff's complaint alleges the following facts. Salomon Smith Barney markets itself as a full-service financial firm that, among other things, provides trained financial consultants to its customers to help its customers earn money. Howell, one of these consultants, represented to plaintiff that he would provide plaintiff with professional, high quality, personal financial services. Relying on Salomon Smith Barney's marketing to the public, its expertise, Howell's representations, and Salomon Smith Barney's "touting [of] defendant Howell's lengthy experience in the commodities trading markets," plaintiff entered into an agreement with Salomon Smith Barney to establish a commodity trading account.

Howell worked to develop plaintiff's trust and confidence in defendants' services by maintaining frequent contact with plaintiff. Regularly, for the period from June 2000 through December 13, 2000, Howell called plaintiff several times a day to tell him about market activity and the status of his account and to provide research results and investment recommendations.

As part of the relationship between defendants and plaintiff, defendants exercised complete control over the execution of plaintiff's commodity transactions, his margin

trading limits, the amount of credit that they were willing to extend to plaintiff to allow him to trade, and the information that they gave him about his orders, trades, and margin status. Defendants knew that the services that they provided to plaintiff were for the purpose of helping plaintiff further his economic and financial interests.

In late summer 2000, Howell encouraged plaintiff to start trading a larger volume of commodity contracts in order for plaintiff to make more money. Howell asked for and received Salomon Smith Barney's permission to raise plaintiff's trading limit from $10,000 to $100,000. In the fall of 2000, plaintiff began to trade larger volumes of commodity contracts. He also began to get margin calls, which required him to pay money to Salomon Smith Barney to bring his account back within his margin limit. Nonetheless, Salomon Smith Barney continued to extend margin credit to plaintiff, regularly allowing him to trade beyond his margin limit as long as he continued to pay the margin calls. On December 13, 2000, plaintiff received a margin call of $6,422; he delivered $7,422 to Salomon Smith Barney that day.

On the following morning, December 14, 2000, plaintiff placed an order for 30 crude oil contracts and an order for three natural gas contracts. Defendants accepted both orders. The order for 30 crude oil contracts was filled. However, defendants did not tell plaintiff that they would not fill the natural gas order or that he might be forced to liquidate the crude oil positions within a day. Later that day, Howell cancelled the order for the three natural gas contracts without advance notice to plaintiff. Even though Howell's action was unusual, he did not follow his routine practice of contacting plaintiff to tell him of the change in his account status. Defendants received a $2,250 commission on plaintiff's crude oil transaction, approximately 10 times the commission that the natural gas order would have generated.

The next day, December 15, 2000, defendants liquidated plaintiff's one-day-old crude oil contracts, because of his overextended margin position, by a forced sale without notice to plaintiff. Liquidating those contracts generated losses on plaintiff's account, increasing plaintiff's margin position to more than twice his trading limit. As a result of a

domino effect on plaintiff's margin position from defendants' liquidation of his contracts, defendants continued to conduct forced sales of plaintiff's commodity contracts and to liquidate his account. In contrast, if defendants had filled the natural gas order and not the crude oil order, plaintiff's account would have profited, he would have avoided the oil contract losses, and he would have stayed within his margin trading limits. If the implications of both orders had been explained to plaintiff, he would have chosen to place the natural gas order only, resulting in no violation of his margin limits. Plaintiff alleges that he sustained damages of more than $259,000 as a result of negligent conduct by defendants in their handling of his commodity trading account.

Defendants' answer incorporated the contract by which plaintiff had established his commodity trading account with Salomon Smith Barney. Therefore, the contract is part of the pleadings and must be considered in assessing whether defendants were entitled to judgment in their favor on the pleadings. *Cf. Jones v. Emerald Pacific Homes, Inc.*, 188 Or App 471, 480, 71 P3d 574, *rev den*, 336 Or 125 (2003) ("A ruling based on evidence *outside of* the pleadings cannot properly be a ruling on a motion for judgment *on* the pleadings." (Emphasis in original.)).

The contract defines the parties' rights and obligations in connection with the trading account. It does not expressly address any of the services that plaintiff alleges that defendants provided to him, such as daily investment advice and information on his account and margin status, or Howell's personal effort to increase plaintiff's trading limit. Despite defendants' routine practice of allowing plaintiff to exceed his margin limits, the express contract terms obliged plaintiff not to exceed margin limits authorized by "any federal agency or exchange" and to immediately pay any amounts owing on margin as consideration for Salomon Smith Barney's acceptance of his trading business.

Under the parties' contract, Salomon Smith Barney had unilateral authority to "limit or reduce [plaintiff's] positions in accounts, to decline to accept any orders and to require that [his] accounts be transferred to another firm," or to "liquidate positions in [his] accounts." Salomon Smith

Barney expressly acted as plaintiff's agent, but only in the sense that the firm's role was to place his trades rather than to be a party to, or to guarantee obligations of any party to, plaintiff's commodities contracts. In the event that Salomon Smith Barney should "deem [it] appropriate based upon its own business judgment notwithstanding the rule of any exchange," the contract gave it the right to liquidate plaintiff's positions, sell any of his property, or cancel any of his open orders to buy or sell property without prior notice in the event that plaintiff failed to deposit sufficient funds in his account to keep it within his margin limit. Plaintiff also expressly acknowledged that he was liable for losses in his account even if the losses arose from actions taken by Salomon Smith Barney that the parties' contract authorized it to take.

Defendants moved pretrial for judgment on the pleadings on plaintiff's negligence claim, arguing that the conduct by defendants for which plaintiff sought to recover economic damages concerned actions that the parties' contract expressly authorized defendants to take, or that defendants' duties arose from the contract and not independently of it, and, consequently, that plaintiff could not prevail on his negligence claim. The court granted defendants' motion, stating that plaintiff could not prevail on his negligence claim because it went "directly to the terms of the contract, and * * * the contract controls." Plaintiff also alleged a claim against defendants for breach of contract. That claim was tried to a jury, which returned a verdict for defendants. Plaintiff challenges on appeal only the trial court's ruling on the negligence claim.

■ The disposition of the parties' dispute turns on whether plaintiff and defendants were in a "special relationship." Because plaintiff seeks solely to recover economic damages from defendants for negligence arising from the parties' contractual relationship, plaintiff must establish that there was a special relationship between the parties that imposed on defendants the obligation to pursue plaintiff's interests and not just their own. *See Bennett v. Farmers Ins. Co.,* 332 Or 138, 160, 26 P3d 785 (2001) (breach of fiduciary duty and tortious breach of duty of good faith and fair dealing related to a contract both require a "special relationship"); *Conway v.*

*Pacific University*, 324 Or 231, 237, 924 P2d 818 (1996) (same for claim of negligent misrepresentation).

■ Whether the nature of a relationship between parties is sufficient to support a negligence claim for economic damages—that is, "[w]hether a relationship is special[—]is driven by the facts." *Shin v. Sunriver Preparatory School, Inc.*, 199 Or App 352, 366, 111 P3d 762, *rev den*, 339 Or 406 (2005) (citation omitted). The sufficiency of the allegations of a special relationship is determined by examining whether, viewed as true, the pleaded facts would permit a factfinder to find that the defendant had entered into a relationship with the plaintiff in which the defendant would exercise judgment *on the plaintiff's behalf* or would assume an obligation to achieve a particular result *on the plaintiff's behalf. Id.* at 366-67.

■ Plaintiff contends that his allegations that defendants' course of dealing with him gave them control of his economic interests and made him dependent on them for his financial success adequately allege that he and defendants were in a special relationship. Plaintiff is mistaken. The relationship that the contract established between defendants and plaintiff is not one that created a special relationship that imposed on defendants the obligation to act to secure or protect plaintiff's economic interests rather than their own. *Bennett* supports that conclusion.

*Bennett* involved claims by an insurance broker, Bennett, against Farmers Insurance Company for breach of contract, breach of fiduciary duty, and tortious breach of the duty of good faith and fair dealing arising from Farmers' termination of Bennett's agency relationship with it. Farmers had solicited Bennett to close his independent insurance agency and to become its district manager, recruiting and training agents to sell Farmers insurance. The parties' agreement characterized Bennett as an independent contractor who maintained his own office, hired his own employees, paid his own expenses, and assumed all risk of business failure. It expressly provided that Farmers could terminate its contractual relationship with Bennett without cause. A contract term also provided, in part, that " '[n]o control is to be exercised by [Farmers] over the time when, the place where, or

the manner in which the District Manager shall operate in carrying out the objectives of this Agreement * * *.' " 332 Or at 162.

Bennett's theory of the case was that Farmers had recruited him to build a successful Farmers agency and then had wrongfully terminated their relationship to obtain the fruits of his investment in the agency. His business contributed $27 million to Farmers' gross revenues over a 12-year period. During that time, Farmers had gradually tightened control over the agency by introducing aggressive performance goals, agent recruiting targets, and requirements for client-contact reporting. According to Bennett, the control that Farmers exercised over his agency created a special relationship between him and Farmers that required Farmers to act as a fiduciary toward him to protect his interest in his agency.

The Supreme Court disagreed. It explained that it is a defendant's exercise of independent judgment *on behalf of a plaintiff*, not the defendant's exercise of control of the plaintiff's activities, that is the gravamen of a special relationship giving rise to a tort duty. *Id.* at 161-62. Noting that Bennett focused on proving that defendants exercised increasing control over his business, the court explained that

> "plaintiff misunderstands the fundamental focus of our inquiry in *Georgetown Realty* [*v. The Home Ins. Co.*, 313 Or 97, 110-11, 831 P2d 7 (1992)] and other 'special relationship' cases. The focus is not on the subject matter of the relationship, such as one party's financial future; nor is it on whether one party, in fact, relinquished control to the other. The focus instead is on whether the *nature of the parties' relationship itself* allowed one party to exercise control in the first party's best interests."

332 Or at 161 (emphasis in original). Most importantly, "the law does not imply a tort duty simply because one party to a business relationship begins to dominate and to control the other party's financial future." *Id.* at 161-62. Instead, "the law implies a tort duty only when that relationship is of the type that, by its nature, allows one party to exercise judgment *on the other party's behalf.*" *Id.* at 162 (citing *Conway,* 324 Or at 241) (emphasis added).

Under *Bennett*, a court's first task is to examine the parties' contract "to determine whether its terms created the type of relationship that gave rise to a duty in tort." *Id*. Noting that a contract term expressly forbade Farmers from interfering in Bennett's business affairs, the court concluded that the contract did not allow for the existence of a special relationship that could give rise to a tort duty:

"Nothing about the relationship as defined in the agreement suggested that [the] plaintiff would relinquish control over his business or that [the defendant] would exercise independent judgment on [the] plaintiff's behalf. * * * As defined by the agreement, the nature of their relationship was not one in which [the defendant] was *to step into plaintiff's shoes and to manage his business affairs*. Accordingly, the parties were not in a 'special relationship,' and [the defendant] did not owe [the] plaintiff a duty in tort."

*Id*. at 162-63 (emphasis added).

Similarly, the relationship that the commodity futures trading contract established between plaintiff and defendants is not one in which defendants assumed any obligation to exercise independent judgment on plaintiff's behalf or to act to secure or protect plaintiff's economic interests. Trading in commodity futures is a highly risky undertaking. *See, e.g.*, B. Apostolou & N. Apostolou, *Investing in Options and Futures: A Primer*, 54 Oil, Gas & Energy Quarterly 317, 323-28 (2005) (describing commodity futures market as the "most risky and speculative of all the markets in the investment arena"). It also is highly regulated by the federal government and by the exchanges through which the trading occurs. *See, e.g.*, 7 USC §§ 1-27; 17 CFR pts 1-171. Here, the contract between plaintiff and Salomon Smith Barney seeks to place all risk of loss as a result of trades in plaintiff's account on plaintiff and to minimize any risk of loss to Salomon Smith Barney. The control that the contract gave defendants over plaintiff's trading activities was control to protect Salomon Smith Barney's interests, not plaintiff's. Under those circumstances, defendants cannot be understood to have had a fiduciary obligation to act to protect plaintiff's economic interests.

In concluding otherwise, the dissent relies on, among other things, our decision in *Wallace v. Hinkle Northwest, Inc.*, 79 Or App 177, 717 P2d 1280 (1986). In *Wallace*, we concluded that, for stockbrokers and their clients, a "special relationship" *may* exist where "[a] stockbroker is a fiduciary [because] his client trusts him to manage and control the client's account and he accepts that responsibility." *Id.* at 181. The favorable result for the plaintiffs in *Wallace* depended on a key distinction from the circumstances here: The plaintiffs alleged that the stockbroker took over trading *on their behalf* and made most or all trades "without either prior approval or acquiescence by [the] plaintiffs." *Id.* at 180. The express terms of the parties' contract granted the broker no discretion to trade *for the clients*. In contravention of the contract, however, the broker allegedly did manage the plaintiffs' stock portfolio *for them* at his discretion. For that reason, the contractual terms were not dispositive. *Id.* at 181. The complaint sufficiently alleged that the stockbroker took responsibility for the clients' financial affairs by making *their* trading decisions *for them*.

Here, in contrast, the control that the contract gave defendants over plaintiff's commodity futures trading account and trading activity was control to protect *their* economic interests, not *plaintiff's*. In other words, the relationship that the contract created was *not* a relationship in which defendants assumed any responsibility to act *on plaintiff's behalf for plaintiff's benefit*. Hence, the trial court did not err in entering judgment on the pleadings in favor of defendants.

Brewer, C. J., Schuman and Ortega, JJ., and Murphy, J. pro tempore, join in this concurrence.

**EDMONDS, J.,** dissenting.

This case presents the issue whether plaintiff can bring a claim in tort or whether he is limited to a remedy for breach of contract. Plaintiff appeals after the trial court dismissed his negligence claim pursuant to ORCP 21 B.

Plaintiff filed a civil complaint against defendants for damages in which he alleged claims based on negligence and breach of contract arising out of actions taken by defendants with regard to his investment account with them.

Defendants moved for judgment on the pleadings under ORCP 21 B as to both claims. The trial court granted defendants' motion as to the negligence claim but denied it as to the breach of contract claim. The breach of contract claim was subsequently tried to a jury, which returned a verdict for defendants. On appeal, plaintiff assigns error to the trial court's ruling dismissing his negligence claim.

ORCP 21 B provides that, "[a]fter the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings." Under ORCP 21 B, a motion for judgment on the pleadings assumes the truth of all well-pleaded facts, and the party pleading a claim is entitled to the benefit of all reasonable inferences that can be drawn in that party's favor. *Simons v. Beard*, 188 Or App 370, 372, 72 P3d 96 (2003). The motion may be granted *only* when the pleadings taken together affirmatively show that the plaintiff has no cause of action against the defendant or when the defendant affirmatively alleges a complete defense that is admitted by the reply. *Salem Sand v. City of Salem*, 260 Or 630, 636, 492 P2d 271 (1971).

Plaintiff, in his third amended complaint, alleged, in part:

"6.  * * * [D]efendant Howell was [plaintiff's] financial consultant acting as his agent to provide him with Financial Consultation and services including his commodities transactions * * *.

"* * * * *

"9.  As part of the relationship between [plaintiff] and the defendants, the defendants had complete control to execute and carry out [plaintiff's] commodities transactions; defendants had complete control over [plaintiff's] margin trading limits; defendants had complete control over the amount of credit they were willing to extend [plaintiff] to allow him to trade, and they had complete control over the information they would impart to [plaintiff] relating to his orders and trades.

"10.  The defendants knew the services they provided [plaintiff] were for the purpose of furthering [plaintiff's] economic and financial interests.

"* * * * *

"44. Defendants owed [plaintiff] the duty to use reasonable care and judgment in their affairs with [plaintiff].

"45. Defendants breached the duties they owed to [plaintiff] in one or more of the following ways:

"a. By failing to timely inform [plaintiff] as to what defendants were going to do with his December 14, 2000 orders;

"b. By failing to disclose to [plaintiff] that Smith Barney was going [to] force him to trade the February 2001 Crude Oil contracts within a day of his purchase on December 14, 2000;

"c. By failing to tell [plaintiff] in a timely manner that Smith Barney would only fill one of his December 14, 2000 commodities orders but not both;

"d. By failing to timely disclose to [plaintiff] on December 14, 2000 that Smith Barney canceled his order for three January 2001 Natural Gas Contracts;

"e. By failing to timely inform [plaintiff] that Smith Barney was going to cancel his December 14, 2000 Natural Gas contracts order.

"f. By failing to properly account for the $7,422 margin call payment [plaintiff] made on December 13, 2000;

"g. By accepting [plaintiff's] December 14, 2000 orders;

"h. By placing [plaintiff's] Crude Oil order on December 14, 2000 without informing him that he would be forced to sell his positions within a day.

"46. As a direct result of defendants' conduct, [plaintiff] was damaged in the following ways:

"a. canceling the Natural Gas contracts caused him lost profits of approximately $69,000.00;

"b. the purchase of the thirty February 2001 Crude Oil contracts caused [plaintiff] losses of approximately $12,200;

"c. defendants were unjustly enriched by the $2,250 in commissions generated from the Crude Oil contracts transaction;

"d. [plaintiff] suffered additional consequential damages estimated to be approximately $176,000 from losses on forced liquidations and profits he would have earned if he had been able to use the profits from the Natural Gas contracts."

In their answer to the third amended complaint, defendants denied the allegations in paragraphs 9, 10, 45, and 46. Defendants' answer also alleged,

"[i]n answering the allegations of paragraph 44, defendants state that their duties and obligations regarding [plaintiff] are governed by the commodity client agreement. Defendants deny the remaining allegations of paragraph 44."

Defendants also alleged in their second affirmative defense:

"[Plaintiff's] relationship with defendants arises from and is governed by the commodity client agreement. As a consequence, [plaintiff] is not entitled to assert claims for negligence against defendants."

In their answer to plaintiff's third amended complaint, defendants attached a copy of the commodity client agreement. It provides, in pertinent part:

"5. I understand that you have, at any time, and in your sole discretion, the right to limit or reduce positions in my accounts, to decline to accept any orders and to require that my accounts be transferred to another firm. I understand that if I do not promptly transfer my positions upon your demand you reserve the right to liquidate positions in my accounts at your discretion. I understand that you in your sole discretion may elect to net settlement payments on foreign exchange contracts where those payments are for the same currency and value date.

"6. I understand you act as agent and not as principal for your clients' commodity futures and commodity options transactions which are effected on exchanges. Consequently, you do not guarantee the performance of the obligations of any party (including your affiliates) to the futures or options contracts purchased and/or sold by your clients. I understand you may act as principal in certain cash, forward and foreign commodity transactions.

"7. Any property belonging to me or in which I have an interest held by you or any of your subsidiaries or affiliates

or carried in any account shall be subject to a general lien and security interest and right of set-off for the discharge of my obligations to you, wherever or however arising and without regard to whether or not you have made advances with respect to such property, and you are hereby authorized to sell and/or purchase any and all such property without notice to satisfy such general lien and security interest. I irrevocably appoint you as my attorney-in-fact with power of substitution to execute any documents for the perfection or registration of such general lien and security interest * * *.

"8. I agree to maintain such collateral and/or margin as you may from time to time in your discretion require and agree to pay immediately on demand any amount owing with respect to any of my accounts. Against a 'short' position in any commodity contract, prior to the maturity thereof, I will give you instructions to cover or furnish you with all necessary delivery documents, and in default thereof you may without demand or notice, cover the liability in the manner, deemed most appropriate by you, or if an order to buy in such contracts cannot be executed under prevailing conditions, you may procure the actual commodity and either make delivery thereof upon any terms or take any other action you deem appropriate.

"9. In the event I fail to deposit sufficient funds to pay for any coins, commodities, contracts for the future delivery thereof, commodity options, or forward commodity and foreign exchange contracts and/or satisfy any demands for original and/or variation margin, or whenever in your discretion you consider it necessary, you may without prior demand or notice, when and if you deem appropriate based upon your own business judgment notwithstanding any rule of any exchange, liquidate the positions in my account, hedge and/or offset those positions in the cash market or otherwise, sell any property belong[ing] to me or in which I have an interest, cancel any open orders for the purchase and sale of any property, or borrow or buy any property required to make delivery against any sales, including a short sale, effected for me, all at my sole risk."

Thereafter, defendants moved for judgment on the pleadings under ORCP 21 B. In substance, they argued,

"The commodity agreement precludes [plaintiff] from proceeding on his claims against defendants. [Plaintiff]

cannot properly assert a negligence claim against defendants because their duties and obligations to [plaintiff] are defined by contract, not tort. * * * Because the pleadings show that [plaintiff] is not entitled to relief on any of his claims, defendants request that the court enter judgment against [plaintiff]."

After hearing argument on the motion, the trial court granted defendants' motion.

In *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992), the court, after reviewing a number of its cases over the past century, observed:

"When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract[.]"

In *Conway v. Pacific University*, 324 Or 231, 240-41, 924 P2d 818 (1996), the court explained one context in which a standard of care independent of the terms of a contract may exist because of the duty undertaken to further the economic interests of a client:

"Another way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a *special relationship* toward the other party. That is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution.

"This special responsibility exists in situations in which one party has hired the other in a professional capacity,

as well as in principal-agent and other similar relationships. It also exists in the type of situation described in *Georgetown Realty*, in which one party has relinquished control over the subject matter of the relationship to the other party and placed its potential monetary liability in the other's hands."

(Emphasis in original.)

We applied these principles in *Wallace v. Hinkle Northwest, Inc.*, 79 Or App 177, 717 P2d 1280 (1986), in the context of a claim against a stockbroker for the breach of a fiduciary duty. In that case, the plaintiffs alleged, in part, that the defendants owed a fiduciary duty to the plaintiffs because the investment agreement between them permitted the defendants to exercise discretionary control over the plaintiffs' security transactions. We held that "[a] stockbroker is a fiduciary if his client trusts him to manage and control the client's account and he accepts that responsibility." *Id.* at 181. We distinguished the facts in *Wallace* from the facts in *Berki v. Reynolds Securites, Inc.*, 277 Or 335, 560 P2d 282 (1977), a case in which the agreement between an investor and a stockbroker was an agreement by the broker to buy and sell at the direction of the investor. Under the circumstances in *Berki*, no fiduciary duty arose because the broker had no control over the investments that were made.

More recently, we applied the principles governing "special relationships" in *Moore Excavating, Inc. v. Consolidated Supply Co.*, 186 Or App 324, 63 P3d 592 (2003). In that case, the defendant contracted to sell pipe and glue to the plaintiff. Although there was evidence that the plaintiff relied on the defendant for information, we held that that fact did not change the nature of their arm's-length contractual relationship into a relationship where the defendant exercised independent judgment on the plaintiff's behalf. We concluded, therefore, that because the plaintiff had not demonstrated a special relationship with the defendant that would give rise to a duty independent of their sales agreement, the trial court correctly granted the defendant's motion for summary judgment on the plaintiff's negligence claim. *Id.* at 334.

Defendants rely on *Berki* and *Moore* to argue that their standard of care is governed exclusively by the commodity client agreement with plaintiff and that they merely exercised their rights in accordance with it. However, when plaintiff is given the benefit of all reasonable inferences from the facts in the pleadings, plaintiff alleges more than an arm's-length agreement. In particular, plaintiff alleges in paragraph 9 of his complaint that, "[a]s part of the relationship between [plaintiff] and the defendants, the defendants had complete control to execute and carry out [plaintiff's] commodities transactions" and had "complete control over [plaintiff's] margin trading limits." Indeed, defendants deny those allegations, thereby creating disputed issues of fact.

Moreover, paragraph 5 of the agreement grants the sole discretion to defendants to "limit or reduce positions in [plaintiff's] accounts[,]" and in the event that plaintiff does not transfer accounts upon defendants' demand, defendants are granted the authority to "liquidate positions in [plaintiff's] accounts at [their] discretion." Paragraph 7 grants authority to defendants "to sell and/or purchase" any property or interest held by plaintiff "whether or not [defendants] have made advances with respect to such property" without notice to plaintiff. Under the terms of paragraph 7, defendants are irrevocably appointed as attorney-in-fact to act on behalf of plaintiff with the power "to execute any documents for the perfection or registration" of a general lien and security interest. Additionally, paragraph 8 provides that, if a "short position" arises, defendants are authorized to "cover the liability in the manner, deemed most appropriate by [defendants], or, if an order to buy in such contracts cannot be executed under prevailing conditions, [defendants] may procure the actual commodity and either make delivery thereof upon any terms or take any other action [defendants] deem appropriate." Finally, paragraph 9 authorizes defendants

"without prior demand or notice, when and if you deem appropriate based upon your own business judgment * * * [to] liquidate the positions in my account, hedge and/or offset those positions in the cash market or otherwise, sell any property belong[ing] to me or in which I have an interest, cancel any open orders for purchase and sale of any property, or borrow or buy any property required to make delivery against any sales * * * all at my sole risk."

When plaintiff is given the benefit of all reasonable inferences that flow from his allegations and from the provisions of the commodity client agreement, it can be reasonably inferred that the parties entered into a relationship whereby defendants would control plaintiff's account and would exercise their discretion to further plaintiff's financial interests. Thus, the facts distinguish this case from *Berki*, where the stockbroker exercised no discretion with respect to the account; rather, the facts are similar to those in *Wallace*, where the defendants' assumption of control over the plaintiffs' investments created a special relationship that implied a duty on the part of the defendants to act in the best interests of the plaintiffs.

Thus, defendants' assertion that they only exercised their rights under the commodity client agreement—though a permissible inference from the facts in the pleadings—is not the *only* reasonable inference that arises from the pleadings when plaintiff's allegations are read in light of the terms of the commodity client agreement.[1] Those allegations also allege facts that, if true, give rise to a fiduciary duty on the part of defendants to exercise independent judgment on plaintiff's behalf to advance his best interests. In summary, when a special relationship exists, like the one plaintiff alleged here, the law will give effect to contractual rights and additionally, to any implied responsibilities that exist outside the terms of the contract. It follows that the trial court erred

---

[1] The concurring opinion holds, in effect, that there is only one permissible inference that can be drawn from the commodity client agreement—that "the control that the contract gave defendants over plaintiff's trading activities was control to protect Salomon Smith Barney's interests, not plaintiffs." 213 Or App at 567. That premise leads the concurring opinion to conclude that, "[u]nder those circumstances, defendants cannot be understood to have had a fiduciary obligation to act to protect plaintiff's economic interests." *Id.* In my view, the concurring opinion's premise is flawed because it fails to heed the applicable standard of review—that a motion for judgment on the pleadings assumes the truth of *all* well-pleaded facts, and that the party pleading a claim is entitled to the benefit of *all* reasonable inferences that can be drawn from the pleadings as a whole, and not just part of the pleadings considered in isolation. Although a trier of fact could find at trial that the commodity client agreement was intended to give defendants control over their own interests only, plaintiff's allegations, when considered with the provisions of the agreement, give rise to the competing inference that the parties intended defendants to exercise control over plaintiff's investments for plaintiff's benefit. That competing inference precludes granting defendants' motion for judgment on the pleadings.

when it reasoned that defendants merely exercised their rights under the commodity client agreement.

As an alternative basis for affirming the trial court, defendants argue that the trial court's error in granting their motion was harmless because plaintiff's negligence and breach of contract claims are based on identical allegations by plaintiff and because the jury returned a verdict for defendants on plaintiff's contract claim after the trial court struck a number of plaintiff's specifications of breach. In defendants' view, "even if the trial court erred in not allowing [plaintiff] to proceed with his negligence claim, that error would be harmless because the trial court and jury determined that [plaintiff's] specifications of breach were deficient." However, we considered a similar argument in *Wallace* and rejected it, in part, because the "plaintiffs were entitled to have [their negligence claim] separately submitted to the jury" based on the summary judgment record before us. 79 Or App at 182.

Our reasoning in *Wallace* informs our decision in this case, subject to the obvious factual contrast between the cases. In *Wallace*, the plaintiff had an opportunity to present evidence supporting his tort claim on summary judgment. Here, the trial court's ruling prevented plaintiff from offering any evidence to support his allegations. Moreover, his theory regarding the negligence claim depends on duties that exist independently of the terms of the agreement with defendants. Consequently, it would be pure conjecture on our part to hold that the same evidence is probative of both claims or that the factual issues are the same merely because the allegations in the claims are identical. Indeed, defendants' contention, though couched as a harmless error argument, in substance resembles an argument regarding issue or claim preclusion. However, the application of those doctrines is predicated on circumstances where a party has previously adjudicated identical issues or has had that opportunity. *Drews v. EBI Companies*, 310 Or 134, 140, 795 P2d 531 (1990). Here, plaintiff has not had the opportunity to litigate his allegations that defendants breached duties owed to him as a result of their fiduciary relationship. For all of these reasons, I am unpersuaded that the limited record in this case permits us to conclude that the trial court's erroneous ruling was harmless.

Landau, Haselton, Wollheim, and Sercombe, JJ., join in this dissent.